**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------X

VINCENT T. LOWRY, as a Seller      :
Representative and in his individual
capacity, and JOSEPH N. GOMPERS,      :

         Plaintiffs,      :

v.      :

OPPENHEIMERFUNDS, INC.,      :
INVESCO, LTD., and MM ASSET
MANAGEMENT HOLDING LLC,      :

         Defendants.      :

------------------------------------------------------X

Case No. _____

ECF Case

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs Vincent T. Lowry ("Lowry") and Joseph N. Gompers ("Gompers") (collectively, "Plaintiffs" or "Sellers"), by and through their undersigned counsel, Klehr Harrison Harvey Branzburg LLP, hereby file this Complaint against Defendants OppenheimerFunds, Inc. ("OFI"), Invesco, Ltd. ("Invesco"), and MM Asset Management Holding LLC ("MMAM") (together with OFI and Invesco, "Defendants"), seeking relief, and in support thereof aver as follows:

## INTRODUCTION

1.      This action arises out of Defendants' wrongful conduct in which they violated Plaintiffs' agreement with OFI for the sale of VTL Associates, LLC ("VTL"), and thereby deprived Plaintiffs of millions of dollars of Earn-Out Payments to which Plaintiffs were entitled under that agreement.[1]

---

[1] A true and correct copy of that certain Sale and Purchase Agreement between Lowry, Gompers, and OFI dated September 4, 2015 is attached hereto as Exhibit A.  Capitalized terms used in this Complaint have the meanings given to them in the SPA unless otherwise defined explicitly in this Complaint.

2.      In 2004, Lowry left a prominent broker-dealer to start his own business. Lowry formed his own independent institutional investment consulting firm, VTL. With only three employees at its inception, Lowry built VTL from the ground up.

3.      Early on, Lowry worked with Standard & Poor's ("S&P") to develop a new investment strategy. Noticing a flaw with investing in standard indices, Lowry wanted to experiment with alternatives to capitalization-weighted indices. Lowry believed revenue-weighted indices would provide superior results. Lowry's test results corroborated his theory: revenue-weighted indices outperformed capitalization-weighted indices. Lowry began providing these indices to clients in 2006.

4.      In 2008, VTL grew and Gompers joined as a member and part owner of the business.

5.      Shortly after developing these indices, Lowry realized this investment methodology was perfect for Exchange-Traded Funds ("ETFs"). Accordingly, VTL applied to sell revenue-weighted ETFs through its trust, RevenueShares ETF Trust (the "Trust"). The Trust offered shares in separate portfolios of investments or ETFs ("RevenueShares ETFs").[2] This novel investment methodology differed from typical ETFs at the time, which invested in companies based on their market capitalization. Lowry's RevenueShares ETFs offered consumers profitable products that were new to the market.

---

[2] RevenueShares ETFs used to trade under different names after OFI and Invesco each purchased the funds. For the reader's convenience, this Complaint refers to these ETFs as RevenueShares ETFs.

2

6.      Soon after entering the market, Lowry's RevenueShares ETFs produced successful results.  Originally starting with three ETFs, RevenueShares ETFs' assets under management ("AUM") grew at such a rate that Lowry developed five more ETFs.  From 2008 to 2015, Lowry created eight different RevenueShares ETFs, all of which used revenue-weighted methodologies.

7.      Within that time, Lowry grew RevenueShares ETFs from $15 million AUM to $1.08 billion AUM.  Under Lowry's management, the ETFs outperformed comparable ETF products offered by large investment firms.  Lowry knew RevenueShares ETFs could continue growing, with the necessary capital to expand.

8.      VTL took in an additional investor and used the new capital to expand its sales and marketing efforts, but VTL needed additional capital to increase its sales and marketing efforts to optimum levels.

9.      Lowry concluded that for RevenueShares ETFs to continue their growth trajectory, VTL needed to find a strategic buyer to acquire and invest in the business.  Therefore, VTL engaged RBC Capital Markets, LLC ("RBC") as its investment banker to initiate a sales process.

10.     The perfect strategic buyer for VTL was one with assets to support RevenueShares ETFs' national and international distribution expansion, large marketing and sales capabilities to promote RevenueShares ETFs, and most importantly, a product portfolio that did not contain any competing ETFs.

11.     After careful consideration of potential purchasers, Lowry determined OFI was the right purchaser.  OFI met all the criteria VTL needed in a strategic buyer.  At the time, OFI

3

provided RevenueShares ETFs with an existing platform and strong brand recognition.  Further, OFI's large marketing and sales team could promote RevenueShares ETFs.  Moreover, OFI's product portfolio did not include any revenue-weighted ETFs.  In fact, OFI wanted to break into the ETF market.  Based on these factors, OFI was the perfect fit for VTL to expand its distribution and grow its AUM.

12.     The parties proceeded with negotiating the terms of a Sale and Purchase Agreement ("SPA").  In consideration of OFI's purchase of VTL, Lowry and Gompers received a Purchase Price equal to a maximum of $85 million, which consisted of a Closing Amount, Three Earn-Out Payments, and a Final Catch-Up Earn-Out Payment.  The Closing Amount was $50 million.  The Earn-Out Payments totaled a maximum of $35 million, spread over a three-year period.  OFI was to pay the Earn-Out Payments beginning three years after the Closing Date.  In determining the amount of the Earn-Out Payments, the SPA applied a formula based on RevenueShares ETFs' financial performance.

13.     Lowry and Gompers agreed to defer more than forty percent of their Purchase Price consideration in the form of Earn-Out Payments because they were confident that with proper and motivated management RevenueShares ETFs would meet the financial performance criteria required to receive one hundred percent of the Earn-Out Payments.  Lowry and Gompers believed that, based on RevenueShares ETFs' past performance and projected performance, the funds easily would generate enough revenue to meet the maximum Earn-Out Payment amounts.

4

14.     Additionally, the SPA set forth obligations of OFI regarding the management of RevenueShares ETFs after the closing.  As part of these obligations, the SPA prohibited OFI from taking any action or omitting to take any action that would reduce the amount of, or probability of receipt of, the Earn-Out Payments.  Further, OFI could not assign any of its contractual obligations under the SPA without Lowry's prior written consent.

15.     In October 2018, in the First Earn-Out Period, OFI, Invesco, and their affiliates embarked on a series of actions that violated OFI's obligations under the SPA and jeopardized the Earn-Out Payments.

16.     On October 18, 2018, Invesco announced it was purchasing OFI from Massachusetts Mutual Life Insurance Company.

17.     At the time, Invesco was one of the largest providers of ETFs, managing a portfolio that included the PowerShares ETFs.  PowerShares ETFs were a direct competitor of RevenueShares ETFs.  In promoting the PowerShares ETFs, Invesco used sales and marketing tactics designed to undermine RevenueShares ETFs.

18.     From October 2018 until the Invesco acquisition of OFI closed on May 24, 2019, Invesco prepared to take over the management of RevenueShares ETFs, ultimately assuming OFI's obligations under the SPA.  Neither Invesco nor OFI, however, received the required written consent from Lowry, as Seller Representative, for this assignment.

19.     After purchasing OFI, Invesco needed to meet a cost-savings synergy target and capitalize on the new influx of products to its portfolio.  To achieve these goals, Invesco ensured

5

that its own legacy ETFs received net in-flows of additional assets, which had the effect of causing assets managed by RevenueShares ETFs to flow out, thus reducing the size of RevenueShares ETFs' AUM.  This approach increased the revenues of Invesco's legacy ETFs, but also limited the amount RevenueShares ETFs could earn, thus preventing Lowry and Gompers from earning the Earn-Out Payments.  Invesco's actions saved it millions of dollars in furtherance of its synergy target, while allowing Invesco's products – but not RevenueShares ETFs – to profit from the OFI acquisition.

20.     As a result of the Defendants' conduct, as described more fully in this Complaint, the performance of RevenueShares ETFs suffered greatly and the funds' AUM and net revenues declined.  The First Earn-Out Payment was $10,384,849, which was $1,281,818 less than the maximum.  Likewise, the Second Earn-Out Payment was only $9,438,606, which was $2,228,061 less than the maximum.  Based on current projections, the Third Earn-Out Payment will not exceed $4.74 million, nearly $7 million less than the maximum target.  Further, based on the financial performance as of the date of filing this Complaint, Sellers are no longer likely to be eligible for any Final Catch-Up Earn-Out Payment.  In total, Defendants' actions have deprived or are likely to deprive Plaintiffs of more than $10 million in Earn-Out Payments, compensation they would have received but for Defendants' misconduct.

## PARTIES

21.     Lowry founded VTL in 2004.  Lowry was the Chairman, Chief Executive Officer, Chief Compliance Officer, and majority owner of VTL and its subsidiaries.  While at VTL, Lowry was the President of RevenueShares and architect of RevenueShares ETFs.  Lowry also acted as

6

the Chief Portfolio Manager for VTL's revenue-weighted indices and RevenueShares ETFs.  The SPA named Lowry as a Seller and Seller Representative.  Specifically, the SPA provided that, as Seller Representative, Lowry was:

> appointed, authorized, and empowered . . . to enforce and protect the rights and interests of Sellers . . . and to enforce and protect the rights and interests of the Seller Representative arising out of or under or in any manner relating to this Agreement . . . and to take any and all actions that the Seller Representative believes are necessary or appropriate under . . . this Agreement for and on behalf of the Sellers, including asserting or pursuing any claim, action, suits, or proceedings.

> Ex. A, SPA § 15.15(a)(iv).

Lowry is a citizen of Pennsylvania.

22.     Gompers is a member and part owner of VTL and a citizen of West Virginia.  Gompers was a Seller under the SPA.

23.     At times relevant to the underlying allegations in this Complaint, OFI was a global asset management company incorporated in Colorado with its principal place of business in New York, New York.  OFI consisted of 16 investment management teams that specialized in equity, fixed income, alternative, multi-asset, and factor and revenue-weighted ETF strategies following its purchase of VTL.  As of February 28, 2019, OFI managed over $229 billion in assets for more than 13 million shareholder accounts.  Prior to its acquisition by Invesco, OFI was a wholly-owned subsidiary of Massachusetts Mutual Life Insurance Company, a mutual life insurance company domiciled in Massachusetts.  On May 24, 2019, Invesco acquired OFI.

24.     Invesco is an independent investment management firm organized under the laws of Bermuda, with its principal place of business in Atlanta, Georgia.  At the start of 2020, Invesco

PHIL1 8756106v.1

managed $1.22 trillion in assets.  Invesco offers its clients a wide variety of active, passive, and alternative investment capabilities.  Invesco is the 6th-largest U.S. retail investment manager and the 13th-largest global investment manager.

25.     MMAM is a Delaware limited liability company and was the ultimate parent of OFI prior to the Invesco merger, which is described below.  MMAM is a wholly-owned subsidiary and holding company for Massachusetts Mutual Life Insurance Company.   MMAM was Massachusetts Mutual Life Insurance Company's holding company for certain asset managers, such as Oppenheimer Acquisition Corporation.   Oppenheimer Acquisition Corporation was Massachusetts Mutual Life Insurance Company's holding company for OFI.  Prior to the merger with Invesco, MMAM was the parent company of OFI.  All of the members of MMAM, as well as Oppenheimer Acquisition Corporation, are citizens of states other than Pennsylvania and West Virginia.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) and (a)(2), in that all parties are citizens of different states, or are citizens of one or more states and citizens of a foreign state, and the amount in controversy exceeds the sum of $75,000.00, exclusive of interests and costs.

27.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

28.     Pursuant to Section 15.2 of the SPA, Plaintiffs and OFI agreed all disputes arising under the SPA would be brought in the courts sitting in this judicial district.

PHIL1 8756106v.1

## FACTUAL BACKGROUND

**I.**    **How VTL Began**

29.    In September 2004, Lowry founded VTL as an independent institutional investment advisory and consulting firm.  Lowry left his job at Smith Barney, a prominent broker-dealer, to start VTL.  VTL provided its clients with investment products, advice, planning, and strategies based on each client's financial goals.  VTL offered its clients innovative ideas, revolutionary concepts and detailed research, along with traditional investment approaches.

30.    VTL also developed custom indices for both fundamental equity indices and custom liability indices for fixed income.  Lowry created these indices after observing large clients moving their investments to indices.

31.    An index measures the performance of securities in a particular sector of the market.  Index investing relies on a passive investment strategy where investors determine which market to invest in and utilize index funds to effectuate their investment plan.  The goal of index investing is to generate returns similar to a broad market index.  Examples of market indices include the Dow Jones, S&P 500, and Nasdaq Composite.

32.    This shift in client preference prompted Lowry to research standard indices and experiment with alternatives to standard indices.

33.    Many standard indices contain securities weighted by their total market capitalization.  Market capitalization is the market value of a publicly traded company's outstanding shares.  A company's market capitalization is influenced by the price of the company's stock or when a company issues or repurchases its shares.  Market capitalization-weighted indices

9

use a stock's market capitalization to determine how much impact that security can have on the index's overall results.  For instance, a security with a larger market capitalization carries a higher weighted percentage in the index.  Therefore, the largest index companies have a greater impact on the value of the index.  Many of the stock market indices weight their securities by market capitalization, such as the S&P 500 Index and the Nasdaq Composite Index.

A.  Lowry Develops His Revenue-Weighted Investment Products

34.    Upon observing his clients' investment results, Lowry believed relying on market capitalization-weighted indices was an inferior investment method.  To verify this, Lowry tested and analyzed the results of investments relying on a company's revenue.

35.    Beginning in March 2005, VTL partnered with S&P to research and analyze data for eight of S&P's index funds.  VTL took this data and reweighted the indices by the companies' revenues instead of their market capitalization.  The findings supported Lowry's conclusion that the revenue-weighted indices outperform capitalization-weighted indices.  Weighting an index by revenue proved to be a superior metric because a company's revenue is based solely on the company's performance, which ultimately drives the company's value.

36.    Based on these results, in 2006, VTL and S&P entered into a proprietary license agreement to sponsor four revenue-weighted versions of the most popular S&P index funds.

37.    After providing these products to clients, Lowry determined that an investment strategy based on revenue-weighting would work well with ETFs.

10

B. Exchange-Traded Funds

38.     An ETF is a fund that contains various types of securities such as bonds, stocks, commodities, futures, or some combination of these.  An ETF owns the underlying assets of the fund.  Like mutual funds, investors can pool their money into the ETF and, in return, receive an interest in that investment.  An investor does not own the underlying assets of the ETF, but rather a share of the ETF.

39.     Similar to a share of stock, an ETF share is a public security that trades on an exchange with its unique ticker symbol.  ETF shares trade at market prices that may not be the same as the net asset value ("NAV") of the shares.  An ETF's NAV is the value of the ETF's assets minus its liabilities, as calculated by the ETF at the end of each business day.  An ETF's holdings are also publicly disclosed each day.

40.     An ETF sponsor, a fund manager or financial company, creates or administers an ETF.  The ETF sponsor designs the base index that assists with the management of the ETF.

41.     ETF sponsors enter into contractual relationships with one or more "Authorized Participants" – financial institutions which are typically large broker-dealers.  These financial institutions supply the securities that make up the fund, and in exchange receive creation units.  A creation unit is a large block of ETF shares.  Once an Authorized Participant receives a block of ETF shares it may sell these ETF shares in the secondary market to investors.  Only Authorized Participants may purchase and redeem shares directly from the ETF and can do so only in large blocks or creation units.

PHIL1 8756106v.1

42.     An ETF's supply of shares is regulated through mechanisms known as creation and redemption.  To create additional shares of an ETF, the Authorized Participant buys shares of the stock from the index and sells or exchanges them to the ETF for new ETF shares at an equal value. In turn, the Authorized Participant sells the ETF shares into the market.  This process increases the ETF's number of shares on the market.

43.     For redemption, an Authorized Participant buys shares of the ETF on the open market.  The Authorized Participant then sells the shares back to the ETF sponsor in exchange for individual stock shares that the Authorized Participant can sell on the open market.  This process reduces the ETF's number of shares available.

44.     Other investors purchase and sell ETF creation units in market transactions at market prices.  An ETF's market price may be more or less than the fund's NAV per share, as the ETF's market price fluctuates during the trading day.

45.     ETF sponsors earn compensation by charging investors a management fee.  Many ETF sponsors base their fees on the fund's AUM.  AUM is the total market value of the investment that an entity or fund manages on behalf of its clients.  ETFs charge management fees based on a fixed percentage of AUM typically expressed in basis points or "bps."  For example, one basis point equals one one-hundredth of a percent.  ETFs with more AUM typically have lower management fees.

PHIL1 8756106v.1

46.     Further, an ETF earns revenue based on its expense ratio and AUM.  An ETF's revenue is calculated by multiplying its total AUM by its expense ratio.  Therefore, the more AUM the higher an ETF's revenue.

47.     In the United States, ETFs are subject to regulatory requirements of the federal securities laws.  ETF sponsors register their funds with the U.S. Securities and Exchange Commission ("SEC") under the Investment Company Act of 1940 ("the Act") as investment companies.  The Act categorizes each ETF as a registered investment company because it issues securities and is primarily engaged in the business of investing in securities.  ETFs require exemptions from certain provisions of the Act before they may commence operations.  As a result, ETF sponsors must apply to the SEC for an order exempting them from certain requirements of the Act to form and operate.

48.     An ETF registers its shares under the Securities Act of 1933.  The Securities Exchange Act of 1934 governs the shares' trading activity.

49.     To register an ETF with the SEC, the ETF sponsor must file a Form N-1A with the SEC.  The Form N-1A is a registration statement that details the ETF shares a company is offering to the public.  Only once the SEC approves the Form N-1A can the ETF offer its shares to the public.

50.     Within the Form N-1A, companies provide the ETF's name, investment objectives, ticker symbol, investment advisors, and portfolio managers.  Once the Form N-1A is approved, the SEC assigns each ETF a CUSIP number, which acts as an identifier for the company or issuer

13

of the security and the type of security.  Overall, the Form N-1A provides the public with comprehensive information regarding a fund.

51.     ETFs must report the amount of money flowing into or out of their accounts on a monthly or quarterly basis.  Fund flows show cash inflows and outflows.  Net inflows, or share purchases, create excess cash for fund managers to invest.  Net outflows, or share redemptions, reduce excess cash for fund managers.

52.     There are many different types of ETFs, each offering different investment strategies.  For instance, there are broad-market ETFs, which track indices such as the S&P 500 index of U.S. stocks.  Others include sector ETFs made up of assets based on a particular industry. Some ETFs only focus on U.S. offerings, while others provide investors with global offerings.

C.  The Development of RevenueShares ETFs

53.     As already discussed above, at ¶¶ 34 through 37, based on his research with S&P, Lowry developed revenue-weighted ETFs, which were new to the market at the time.  Lowry's strategy behind revenue-weighted ETFs was similar to his revenue-weighted indices.  The ETFs re-weight the constituent securities of a benchmark S&P index according to the revenue earned by the companies in that S&P index.  The resulting index contains the same securities as the corresponding benchmark S&P index, but in different proportions.

54.     These revenue-weighted ETFs rely on smart beta investment strategies.  Smart beta ETFs use a rules-based, systematic approach when choosing stock from a particular index to include in an ETF.  The smart beta methodology identifies factors with the potential to generate positive risk-adjusted returns compared with market-capitalization weighted index funds.  Smart

14

beta ETFs screen companies based on fundamental analysis principles to determine which companies should be given a larger piece of the index.  The goal of using smart beta methodology is to generate increased returns or enhanced risk profile.

55.     On February 13, 2008, the SEC granted VTL an exemption relief order pursuant to the Act, allowing VTL to sponsor its ETFs.  Pursuant to the order, VTL registered these ETFs under its RevenueShares ETF Trust, a Delaware statutory trust registered under the Act.  Lowry served as the investment advisor to the Trust.

56.     VTL listed each ETF's shares on the NYSE Arca, Inc. with their own ticker symbol and registered the ETFs under their own CUSIP number.  Each ETF's investment objective was to outperform the total return performance of the ETF's corresponding benchmark S&P index.

57.     VTL launched its first three ETFs later in February 2008.  These three funds were the Large Cap Fund (RWL), the MidCap Fund (RWK), and the Small Cap Fund (RWJ).  The Large Cap Fund (RWL) consisted of the S&P LargeCap 500 securities; the Mid Cap Fund (RWK) consisted of the S&P MidCap 400 securities; and the Small Cap Fund (RWJ) consisted of the S&P SmallCap 600 securities.

58.     On February 22, 2008, RevenueShares ETFs opened trading with $15.06 million AUM.

59.     RevenueShares ETFs sold its shares through a broker-dealer platform.  This platform, which consisted of over 40 broker-dealers, sold frequently to registered investment advisors.  RevenueShares ETFs charged its customers an average management fee of 52 bps.

PHIL1 8756106v.1

60.     RevenueShares ETFs quickly experienced success and expanded operations.  This novel investment methodology offered consumers profitable products that were new to the market.  In November 2008, VTL introduced two more ETFs to the market.  These two additional funds were the ADR Fund (RTR), which consisted of the S&P ADR securities, and the Financial Sector Fund (RWW), which consisted of the S&P 500 Financials Index securities.

61.     On November 20, 2008, these funds began trading and RevenueShares ETFs' AUM increased to $46.5 million.

D.   RevenueShares Becomes Successful

62.     Over several years, VTL's RevenueShares investment methodology proved successful and VTL continued to expand its RevenueShares ETF offerings.  In October 2008, VTL's operations grew with Gompers joining as a member and part owner of the business.  On January 21, 2009, VTL launched the Navellier Overall A-100 Fund (RWV), which contained Navellier Overall A-100 Index securities.  As a result, RevenueShares ETFs' AUM increased to $65.2 million.

63.     On October 1, 2013, VTL launched the Ultra Dividend Revenue ETF (RDIV), which contained the top 60 stocks in the S&P 900.  At that time, RevenueShares ETFs' AUM amounted to $573.1 million.

64.     On February 2, 2015, VTL launched its final ETF, the Global Growth Fund (RGRO).  This ETF consisted of select securities in the S&P Global Brand Market Index.  Upon RGRO's launch, RevenueShares ETFs' AUM totaled $1.04 billion.

16

65.     Lowry's smart beta methodology delivered superior financial performance.  For instance, RevenueShares RWL ETF and RDIV ETF were five-star rated funds providing double-digit annualized returns.   Further, each RevenueShares ETF consistently outperformed its benchmark market capitalization-weighted index on both a calendar year and rolling 3-year basis.  During this time, RevenueShares ETFs also outperformed their competitors, including Invesco's PowerShares ETFs.

66.     By 2015, VTL had grown from a three-employee start-up into a highly successful investment firm that managed the top-performing and highly lucrative RevenueShares ETFs.

**II.     RevenueShares ETFs Seeks a Strategic Buyer to Grow the Business**

67.     At the beginning of 2015, Lowry began searching for ways to expand RevenueShares ETFs' distribution.  While RevenueShares ETFs' smart beta methodology proved successful, Lowry wanted to increase RevenueShares ETFs' AUM to continue the funds' growth trajectory.  To achieve this, VTL wanted to expand its distribution and increase its marketing and sales presence.  Yet, VTL's small size made such an effort difficult.

68.     Prior to 2013, VTL's entire RevenueShares ETF business was self-funded.  In 2013, to raise needed capital, VTL took in an equity investment from Suzhou Industrial Park Kaida Venture Capital, a Chinese private-equity firm.  VTL spent the vast majority of these funds on marketing and sales.  With this investment VTL was able to increase its marketing and sales efforts, but it was not sufficient to achieve the growth Lowry knew was possible.  As a result, in 2015, Lowry began searching for a strategic buyer to purchase the business.

17

A. VTL Enters into a Sales Process

69.    In May 2015, VTL retained RBC to act as its financial advisor to manage a sales process.  As part of this process, RBC created a presentation for potential buyers, called a Confidential Information Memorandum ("CIM").  The CIM described the key factors of VTL's business and operations of RevenueShares ETFs as well as VTL's financial performance to date and future performance projections.

70.    The CIM also included financial forecasts prepared from the ETFs' past performance.  These forecasts summarized the expected future performance of RevenueShares ETFs based on an expanded distribution from the buyer.  Specifically, these calculations detailed the effect an expanded distribution would have on the net flows for each individual ETF from 2015 into 2020.  During that same period, the projections showed that RevenueShares ETFs' net asset flows would increase from $1.04 billion to $6.614 billion.   Further, from 2014 to 2020, the ETFs' revenues would grow from $3.917 million to $31.93 million.  The projections forecasted ETFs' Compound Annual Growth Rate or "CAGR" to average 38.3% in the years 2015-2020.  These financial metrics reflected that with the right strategic buyer RevenueShares ETFs' distribution expansion would prove successful.

71.    The presentation also compared differing financial forecasts for RevenueShares ETFs that varied based on the investment amount the future buyer put into RevenueShares ETFs.  These projections revealed that as RevenueShares ETFs' distribution expanded AUM levels would increase, which in turn would generate more ETF revenue.   The CIM showed that if RevenueShares ETFs were not sold to a third party, its revenue nonetheless would increase to

18

$31.93 million by 2020.  For comparison, the presentation provided buyers with the financial performance of other revenue-weighted ETFs whose growth increased significantly after a merger or acquisition.

B.  The Optimal Strategic Buyer Needed to Fulfill Certain Criteria

72.     Lowry sought a strategic buyer that would provide the best opportunity to achieve these financial projections.  Lowry knew that the best strategic buyer was one that could grow RevenueShares ETFs to their full capacity while maintaining the successful smart beta methodology.

73.     At that time, VTL needed additional resources to expand RevenueShares ETFs' distribution force.  VTL's full-time sales team was small with less than ten employees dedicated to sales and marketing.  Until 2010, VTL attempted to enhance its distribution capabilities through a third-party marketing company and then, in 2013, switched to developing an internal sales team.

74.     The small size of VTL's marketing and sales team limited the products VTL could offer and its ability to expand its distribution.  For instance, 46% of RevenueShares ETFs' AUM was from five states – Maryland, Pennsylvania, California, New York, and New Jersey. Additionally, VTL was unable to focus on institutional markets, despite a high demand for such products.

75.     For these reasons, Lowry sought a strategic buyer that would provide the needed sales and marketing support, meaning enhanced retail and institutional distribution capability and marketing support.  Lowry also sought a buyer that would continue the investment strategies he

PHIL1 8756106v.1

developed.  Finally, the purchaser could not provide products that competed with RevenueShares ETFs, such as Invesco's PowerShares, Vanguard's ETFs, or BlackRock's iShares.

### C. OFI is the Successful Bidder

76.     In the sales process, OFI emerged as the bidder most qualified to meet Lowry's vision and VTL's needs for future growth.  At that time, OFI was one of the largest asset management companies in the United States, with a respected name brand.  OFI operated internationally and offered a large platform to enable RevenueShares ETFs to expand its distribution.  OFI also offered a large existing customer base of over 13 million shareholder accounts and $240 billion AUM.  Most importantly, none of OFI's products directly competed with RevenueShares ETFs.  OFI's portfolio did not include any ETFs in its product offerings.  In fact, OFI was seeking to expand its client offerings into the smart beta ETF space.  VTL's RevenueShares ETFs provided OFI with an opportunity to provide its clients with the highly-rated revenue-weighted ETFs.

### III.     **OFI Purchases VTL**

### A. Entry into the Sale and Purchase Agreement in 2015

77.     After Lowry selected OFI as the right strategic buyer for RevenueShares ETFs, OFI and the Sellers negotiated the SPA.  The parties to the SPA were Lowry and Gompers as Sellers, OFI as Purchaser, and VTL as the entity acquired.

78.     The parties to the SPA executed the SPA on September 4, 2015 and closed the transaction on December 2, 2015.

79.     Pursuant to Section 3.1 of SPA, the Purchase Price consisted of a Closing Amount plus Earn-Out Payments.  The Closing Amount, which OFI paid at closing, was $50 million.

80.     According to Exhibit A of the SPA, Lowry and Gompers each received a ratable portion of the Purchase Price.  The SPA allocated the Purchase Price based on the percentage of issued and outstanding membership units of VTL that each of them owned.  With respect to the Closing Amount, Gompers was allocated "18% plus $250,000" of the adjusted Closing Amount. Lowry was allocated "82% minus $250,000" of the adjusted Closing Amount.

B.  The Earn-Out Periods and Payments

81.     In general terms, an earn-out is a payment made to the sellers of a business, at some point after the closing, and based on the financial performance of the business over a designated period of time after the closing.  An earn-out is a component of purchase price consideration and enables buyer and seller to share in the financial success of the business after closing.  In the SPA, Lowry and Gompers agreed to accept up to $35 million, out of the total transaction consideration of $85 million, in the form of earn-out payments.

82.     Under Section 3.5 of the SPA, there were three Earn-Out Periods.  At the end of each Earn-Out Period Lowry and Gompers would receive a ratable portion of each applicable Earn-Out Payment.  At the end of the Third Earn-Out Period, Sellers were eligible to receive a Final Catch-Up Earn-Out Payment depending on the amount of the Third Earn-Out Payment.  The total amount of each Earn-Out Payment was contingent on the performance of RevenueShares ETFs.

21

83.     The SPA defined the First Earn-Out Period as: "the twelve (12) month period ending on the third anniversary of the Closing Date (or, if the Closing Date is not the last day of a month, the last day of the month in which the Closing occurs)." *Id.* at § 1.   Based on the transaction's closing date, the First Earn-Out Period ran from January 1, 2018 to December 31, 2018, inclusive.

84.     The SPA calculated the First Earn-Out Payment as follows:

(a)     in the event that the Net Revenues for the First Earn Out Period, as determined pursuant to Section 10.1 (such Net Revenue, the "First Earn-Out Revenue Amount"), is equal to or greater than the Maximum Target Revenue Amount with respect to the First Earn Out Period, Eleven Million Six Hundred Sixty-Six Thousand Six Hundred Sixty-Seven Dollars ($11,666,667);

(b)     in the event that the First Earn-Out Revenue Amount is equal to or less than the Minimum Target Revenue Amount with respect to the First Earn-Out Period, Zero Dollars ($0); or

(c)     in the event that the First Earn-Out Revenue Amount is greater than the Minimum Target Revenue Amount with respect to the First Earn-Out Period but less than the Maximum Target Revenue Amount with respect to the First Earn-Out Period, the product of:

(i) Eleven Million Six Hundred Sixty-Six Thousand Six Hundred Sixty-Seven Dollars ($11,666,667); and

(ii) the quotient of:

(x)(A) the First Earn-Out Period CAGR minus (B) the Minimum Revenue CAGR, divided by

(y) thirty-two percent (32%) (which represents (A) the Maximum Revenue CAGR minus (B) the Minimum Revenue CAGR).

provided, however, for the avoidance of doubt, the Buyer and the Sellers hereby acknowledge and agree that all First Earn-Out Payment amounts, if any, payable to

22

the Sellers shall be treated for tax purposes as a portion of the Purchase Price and as payment for their respective Company Interests . . .

*Id.*

85.     The SPA defined the Second Earn-Out Period as: "the twelve (12) month period ending on the fourth anniversary of the Closing Date (or, if the Closing Date is not the last day of a month, the last day of a month in which the Closing occurs)."  *Id.*  Based on the transaction's closing date, the Second Earn-Out Period ran from January 1, 2019 to December 31, 2019, inclusive.

86.     The SPA set forth the Second Earn-Out Payment as follows:

(a)     in the event that the Net Revenues for the Second Earn Out Period, as determined pursuant to Section 10.1 (such Net Revenue, the "Second Earn-Out Revenue Amount"), is equal to or greater than the Maximum Target Revenue Amount with respect to the Second Earn-Out Period, Eleven Million Six Hundred Sixty-Six Thousand Six Hundred Sixty Seven Dollars ($11,666,667);

(b)     in the event that the Second Earn-Out Revenue Amount is equal to or less than the Minimum Target Revenue Amount with respect to the Second Earn-Out Period, Zero Dollars ($0); or

(c)     in the event that the Second Earn-Out Revenue Amount is greater than the Minimum Target Revenue Amount with respect to the Second Earn-Out Period but less than the Maximum Target Revenue Amount with respect to the Second Earn-Out Period, the product of:

(i) Eleven Million Six Hundred Sixty-Six Thousand Six Hundred Sixty-Seven Dollars ($11,666,667); and

(ii) the quotient of:

(x)(A) the Second Earn-Out Period CAGR minus (B) the Minimum Revenue CAGR, divided by

23

(y) thirty-two percent (32%) (which represents (A) the Maximum Revenue CAGR minus (B) the Minimum Revenue CAGR).

provided, however, for the avoidance of doubt, the Buyer and the Sellers hereby acknowledge and agree that all Second Earn-Out Payment amounts, if any, payable to the Sellers shall be treated for tax purposes as a portion of the Purchase Price and as payment for their respective Company Interests . . .

*Id.*

87.    The SPA defined the Third Earn-Out Period as: "the twelve (12) month period ending on the fifth anniversary of the Closing Date (or, if the Closing Date is not the last day of a month, the last day of the month in which the Closing occurs)."  *Id.*  Based on the transaction's closing date, the Third Earn-Out Period runs from January 1, 2020 to December 31, 2020, inclusive.

88.    The SPA calculated the Third Earn-Out Payment as follows:

(a)    in the event that the Net Revenues for the Third Earn Out Period, as determined pursuant to Section 10.1 (such Net Revenue, the "Third Earn-Out Revenue Amount"), is equal to or greater than the Maximum Target Revenue Amount with respect to the Third Earn-Out Period, Eleven Million Six Hundred Sixty-Six Thousand Six Hundred Sixty Seven Dollars ($11,666,667);

(b)    in the event that the Third Earn-Out Revenue Amount is equal to or less than the Minimum Target Revenue Amount with respect to the Third Earn-Out Period, Zero Dollars ($0); or

(c)    in the event that the Third Earn-Out Revenue Amount is greater than the Minimum Target Revenue Amount with respect to the Third Earn-Out Period but less than the Maximum Target Revenue Amount with respect to the Third Earn-Out Period, the product of:

(i) Eleven Million Six Hundred Sixty-Six Thousand Six Hundred Sixty-Seven Dollars ($11,666,667); and

(ii) the quotient of:

24

(x)(A) the Third Earn-Out Period CAGR minus (B) the Minimum Revenue CAGR, divided by

(y) thirty-two percent (32%) (which represents (A) the Maximum Revenue CAGR minus (B) the Minimum Revenue CAGR);

provided, however, for the avoidance of doubt, the Buyer and the Sellers hereby acknowledge and agree that all Third Earn-Out Payment amounts, if any, payable to the Sellers shall be treated for tax purposes as a portion of the Purchase Price and as payment for their respective Company Interests. . . .

*Id.*

89.     The SPA also set forth a Final Catch-Up Earn-Out Payment available to the Sellers after the Third Earn-Out Payment.  The SPA provided that Sellers would earn the Final Catch-Up Earn-Out Payment:

(a)     in the event that no Initial Catch-Up Earn-Out Payment has been made and the Third Earn-Out Revenue Amount is equal to or greater than the Maximum Target Revenue Amount with respect to the Third Earn-Out Period, an amount equal to the excess, if any, of:

(x) Thirty-Five Million Dollars ($35,000,000), over

(y) the aggregate Earn-Out Payments paid to the Sellers in respect of the First Earn-Out Payment, the Second Earn-Out Payment, the Third Earn-Out Payment, and the Initial Catch-Up Earn-Out Payment (including any Advance Payment Amounts (and interest thereon) set-off by the Buyer from any such Earn-Out Payments pursuant to Section 3.5); or

(b) in all other events, Zero Dollars ($0);

provided, however, for the avoidance of doubt, the Buyer and the Sellers hereby acknowledge and agree that all Final Catch-Up Earn-Out Payment amounts payable to the Sellers shall be treated for tax purposes as a portion of the Purchase Price and as payment for their respective Company Interests. . . .

*Id.*

PHIL1 8756106v.1

The Final Catch-Up Earn-Out Payment allowed Sellers to recover up to one hundred percent of any shortfall between \$11,666,667 and the amounts paid initially on account of the First and Second Earn-Outs, if the Third Earn-Out Payment was equal to or greater than \$11,666,667.

90.     Lowry and Gompers agreed to defer more than forty percent of the Purchase Price and receive it in the form of an earn-out because they were confident in RevenueShares ETFs' future performance, with the management they hand-picked.  Lowry and Gompers believed reasonably that with OFI managing RevenueShares ETFs, the business would generate the maximum amount targeted for each Earn-Out Period, which is \$11,666,667.  Lowry and Gompers based their decision on, among other factors, the fact that OFI did not have a competing ETF business that could potentially divert assets from RevenueShares ETFs.  This factor also supported the notion that OFI would aggressively market and develop RevenueShares ETFs, thus expanding distribution and increasing AUM.

91.     Exhibit A of the SPA provided the allocation amounts for the Earn-Out Payments. For the First Earn-Out Payment, Gompers was allocated 18% and Lowry was allocated 82%.

92.     For the Second Earn-Out Payment, Gompers was allocated "18% plus the product of \$250,000 multiplied by the percentage of the maximum Second Earn-Out Payment (i.e., \$11,666,667) that is earned (such product the "Second Earn-Out Additional Amount")."  *Id.* at Ex. A.  Lowry was allocated "82% minus the product of \$250,000 multiplied by the percentage of the maximum Second Earn-Out Payment (i.e., \$11,666,667) that is earned."  *Id.*

PHIL1 8756106v.1

93.     For the Third Earn-Out Payment, Gompers was allocated "18% plus the product of $250,000 multiplied by the percentage of the maximum Third Earn-Out Payment (i.e., $11,666,667) that is earned (such product the "Third Earn-Out Additional Amount")." *Id.*  Lowry was allocated "82% minus the product of $250,000 multiplied by the percentage of the maximum Third Earn-Out Payment (i.e., $11,666,667) that is earned." *Id.*

94.     For the Final Catch-Up Earn-Out Payment, Gompers was allocated "18% plus the amount by which the Second Earn-Out Additional Amount and the Third Earn-Out [A]dditional Amount total less than $500,000." *Id.*  Lowry was allocated "82% minus the amount by which the Second Earn-Out Additional Amount and the Third Earn-Out [A]dditional Amount total less than $500,000." *Id.*

C.   SPA Provisions Regarding Management of the Business After the Closing

95.     The SPA contained provisions that obligated OFI to provide the Seller Representative with periodic reports of the financial performance of the business after the closing and provisions related to the management of the business through the end of the last Earn-Out Period.  Section 10.1 summarized the procedure for OFI to deliver these reports to the Seller Representative.

96.     Section 10.2(a), titled Management of the Business, provided that:

Following the Closing, during the period ending on the last day of the Third Earn-Out Period, (i) subject to the other provisions of this Section 10.2, **the business of the Company and any Subsidiary shall be managed in the sole and absolute discretion of the Buyer, and (ii) the Buyer shall not take or omit to take any action for the purpose of reducing or eliminating the amount of, or reducing the probability of receipt of, any Earn-Out Payment.**  With respect to each of the Individual Sellers who shall be employed by the Buyer following the Closing,

27

such Individual Seller's service for the Buyer shall be in accordance with and subject to the corporate policies of the Buyer as in effect from time to time, it being acknowledged and agreed that such Individual Seller's entitlement to any portion of any Earn Out Payment shall not be conditioned on such service or policies.

*Id.* at § 10.2(a) (emphasis added).

D.   SPA Provisions Barring Assignment of OFI's Obligations Under the SPA

97.   To further ensure OFI remained in charge of the management of RevenueShares ETFs throughout the Earn-Out Periods, the SPA precluded OFI from assigning any of its obligations.  Section 15.1 of the SPA provided that:

Except as otherwise provided in this Agreement, no party hereto shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other parties hereto and any such attempted assignment without such prior written consent shall be void and of no force and effect; provided, however, that the Buyer may assign its rights hereunder to an Affiliate of the Buyer or any subsequent purchaser of the Company; **provided, further, that no such assignment shall reduce or otherwise vitiate any of the obligations of the Buyer hereunder**.  This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties hereto.

*Id.* at § 15.1 (emphasis added).

In other words, OFI could not assign its obligations to manage RevenueShares ETFs until the end of the Earn-Out Periods, and while OFI could assign its rights to an Affiliate or purchaser, such assignment of rights could not cancel OFI's continuing covenant to perform all of its obligations.

E.   Additional Relevant Provisions

98.   Section 15.2 of the SPA, titled Governing Law; Jurisdiction; Forum states, in relevant part: "This Agreement shall be construed, performed and enforced in accordance with,

and governed by, the laws of the State of New York, without giving effect to the principles of conflicts of laws thereof." *Id.* at § 15.2.

99.    Section 15.6 of the SPA, titled Amendments; Waivers states:

This Agreement may be amended or modified, and any of the terms, covenants representations, warranties or conditions hereof maybe waived, only by a written instrument executed by the Buyer and the Seller Representative, or in the case of a waiver, by the Buyer or the Seller Representative, as applicable, waiving compliance.   Any waiver by the Buyer or the Seller Representative of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be nor construed as a further or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

*Id.* at § 15.6.

100.    Section 8.9 of the SPA contained a covenant not to compete that bound Lowry and Gompers.  It provided that:

Each Individual Seller covenants that during the Restricted Period, such Individual Seller shall not, directly or indirectly, for himself or on behalf of or in conjunction with any other Person, whether as an agent, partner, joint venture, investor or otherwise, engage in, or own any interest in, any Competitive Enterprise, it being understood and agreed that the business of the Company and its Subsidiary is conducted throughout the world (the "<u>Territory</u>") and that the Company and its Subsidiary effectively may be conducted from any location throughout the Territory.   Notwithstanding the foregoing, each Seller may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Seller is not a controlling Person of, or member of a group which controls, such Person, and does not, directly or indirectly, own two percent (2%) or more of any class of securities of such Person.

*Id.* at § 8.9.

101.    The SPA defined the Restricted Period in Section 8.9 to mean: "the period commencing on the Closing Date and ending on the third anniversary of the Closing Date."

102.    The SPA included the covenant not to compete to prevent Lowry and Gompers from creating new ETF products that would compete directly with RevenueShares ETFs.  OFI's decision to require Lowry and Gompers to enter into a three-year non-compete reflects OFI's belief, at the time, that allowing Lowry and Gompers to compete would negatively affect OFI's ability to manage and expand RevenueShares ETFs.

F.   Conduct of the Business After Closing and Prior to Inception of the First Earn-Out Period

103.    After the closing, former VTL personnel assisted OFI with managing RevenueShares ETFs.  This included educating the OFI sales team about RevenueShares ETFs. RevenueShares' RWJ and RDIV quickly became two of OFI's largest ETFs.  As a result, RevenueShares ETFs were on pace to achieve 120% of the target CAGR for the First Earn-Out Payment.

104.    RevenueShares ETFs' success incentivized OFI to grow the funds.  If RevenueShares ETFs achieved their full CAGR, then OFI would be the long-term beneficiary. OFI did not have any ETFs in its portfolio prior to the VTL acquisition motivating it to ensure RevenueShares ETFs were successful.

105.    In 2017, OFI closed three of the smallest RevenueShares ETFs.  OFI liquidated the RevenueShares ADR Fund, RevenueShares Navellier Overall A-100 Fund and the RevenueShares Global Growth Fund.

106.    Prior to closing these ETFs, OFI first consulted with Lowry and obtained his consent.

30

107.    OFI simultaneously added new ETFs to offset the effect of these fund closures. These new funds counted towards the Earn-Out Payments resulting in a net increase of RevenueShares ETFs' portfolio assets.

108.    The new ETFs included: (i) ESG Revenue ETF; (ii) Global ESG Revenue ETF; (iii) Global Revenue ETF; (iv) International Revenue ETF; (v) Emerging Markets ETF; (vi) International Ultra Dividend Revenue ETF; and (vii) Emerging Markets Ultra Dividend Revenue ETF.

109.    OFI also incentivized its sales team to expand the distribution of RevenueShares ETFs. Among other things, OFI implemented a sales program titled "ETF Sprint Initiative." This initiative provided the top sales representatives with additional bonuses if they achieved the AUM targets for RevenueShares ETFs.

## IV.    OFI Breaches the SPA by Selling its Business to Invesco

### A.    Invesco Announces the Acquisition of OFI

110.    In August 2018, Massachusetts Mutual Life Insurance Company started working with an investment bank to consider strategic options for OFI.

111.    On September 21, 2018, news outlets reported that Invesco was finalizing a deal to purchase OFI.

112.    On October 18, 2018, Invesco filed a Form 8-K, publicly announcing that it was acquiring OFI for about $5.7 billion in stock. At the time, Invesco was the fourth-largest financial manager of ETFs with $190 billion AUM in 49 different ETFs.

PHIL1 8756106v.1

113.     Invesco's ETF portfolio consisted primarily of PowerShares ETFs, which utilized smart beta methodologies.   Since 2006, Invesco had managed the PowerShares ETFs.   As previously noted, in promoting the PowerShares ETFs, a significant competitor, Invesco used sales and marketing tactics designed to undermine RevenueShares ETFs.   In February 2018, Invesco had acquired one of its ETF competitors, Guggenheim Investments.   After this acquisition, Invesco changed its ETF trust's name from PowerShares Exchange-Traded Fund Trust to Invesco Exchange-Traded Fund Trust.

114.     Invesco attached a copy of the agreement and plan of merger (the "Invesco-OFI Merger Agreement") to its October 24, 2018 Form 10-Q.   The Invesco-OFI Merger Agreement described a transaction between Invesco and two of its holding companies specially created for the acquisition, Gem Acquisition Corporation and Gem Acquisition Two Corporation, on the one hand, and Oppenheimer Acquisition Corporation, an affiliate of MMAM, on the other hand.

115.     Oppenheimer Acquisition Corporation was the holding company for OFI. Likewise, MMAM was the holding company for Oppenheimer Acquisition Corporation.

116.     In consideration for the sale of its interests in Oppenheimer Acquisition Corporation, including OFI, MMAM received a combination of common and preferred equity consideration.

117.     The transaction took place in two steps.   In the first step, Oppenheimer Acquisition Corporation merged with and into Gem Acquisition Corporation resulting in Oppenheimer Acquisition Corporation becoming the surviving corporation and a wholly-owned subsidiary of

32

Invesco.   Immediately following this, the surviving corporation merged with and into Gem Acquisition Two Corporation.

118.   Invesco, however, reported in its Form 10-K for the period ending December 31, 2019 that Oppenheimer Acquisition Corporation and OFI were wholly-owned subsidiaries of Invesco.

119.   Under Section 2.9 of the Invesco-OFI Merger Agreement, the certificate of incorporation and bylaws of Gem Acquisition Two Corporation governed the new entity.

120.   Pursuant to Sections 2.10 and 2.11 of the agreement, the directors and officers of Gem Acquisition Corporation became the initial directors and officers of Oppenheimer Acquisition Corporation following the merger of Oppenheimer Acquisition Corporation with and into Gem Acquisition Corporation.   Following the second step of the transaction, the initial directors and officers of Gem Acquisition Two Corporation became the initial directors and officers of the surviving entity.   At the conclusion of these transactions, none of OFI's directors and officers remained.

121.   Section 5.3 required the advisor to OFI's ETFs to obtain the required consents and approvals for each OFI fund to merge with Invesco's funds.   In addition, each advisor to OFI's ETFs was to obtain the required approvals for the funds' new advisory agreements.

122.   The Invesco-OFI Merger Agreement also set forth the representations and warranties of Oppenheimer Acquisition Corporation.   Section 3.8(a) provided in pertinent part:

> except as set forth in <u>Section 3.8 (a)</u> of the Company Disclosure Schedule, none of the Acquired Companies is party to or bound by any of the following as of the date

33

hereof . . .any Contract relating to the acquisition or disposition of any business, capital stock or assets of any Person (whether by merger, sale of stock, sale of assets or otherwise) for consideration greater than $500,000 or that has any remaining obligations under any "earn-out" or other contingent consideration provisions. . .

Invesco-OFI Merger Agreement § 3.8(a).

123.    At this time, Oppenheimer Acquisition Corporation and OFI knew that OFI had remaining obligations to the Sellers regarding their Earn-Out Payments.

124.    Section 3.8(b) provided that:

Except as otherwise disclosed in <u>Section 3.8(b)</u> of the Company Disclosure Schedule, no Acquired Company is, and to the Knowledge of the Company, no other party is, in material breach or default of any Material Contract and no event has occurred that . . . would constitute such a material breach or default by any Acquired Company, or to the Knowledge of the Company, any other party thereto.

*Id.* at § 3.8(b).

125.    Invesco did not publicly release the Company Disclosure Schedule to the Invesco-OFI Merger Agreement.  As such, Plaintiffs have not been able to review the Company Disclosure Schedule prior to filing this Complaint.

126.    The Invesco-OFI Merger Agreement also set forth certain indemnification obligations.  Section 9.2(a) provided, in pertinent part:

From and after the Closing, and subject to this <u>Article 9</u> [MMAM] shall indemnify and hold harmless [Invesco] and each of its Subsidiaries and Affiliates . . . from and against [MMAM]'s Pro Rata Share of any and all Losses to the extent resulting from (i) any breach of representation or warranty made by the Company in <u>Article 3</u> . . .

*Id.* at § 9.2(a).

34

127.    Section 9.2(b) set forth:

[T]he Buyer Indemnitees shall not be entitled to indemnification, or to otherwise make a claim for indemnity, under <u>Section 9.2(a)(1)</u> (i) unless and until the aggregate amount of the Losses that would otherwise be payable exceeds, on a cumulative basis, an amount equal to $172,500,000 (the "<u>Indemnification Deductible</u>"), and then only to the extent such Losses exceed the Indemnification Deductible . . .

*Id.* at § 9.2(b).

128.    As of the closing date of the Invesco-OFI Merger Agreement, May 24, 2019, the potential liability remaining to Sellers under the SPA was approximately $24.6 million.    Under the Invesco-OFI Merger Agreement, Invesco could not seek indemnification from MMAM or OFI for the cost of the remaining Earn-Out Payments.

129.    Prior to announcing the transaction with Invesco, and contrary to the provisions of Section 15.1 of the SPA, OFI did not seek Lowry's consent, as Seller Representative.

B.  <u>Lowry Notifies OFI and Invesco that He Did Not Consent to any Assignment</u>

130.    On October 31, 2018, after reviewing Invesco's public disclosures, Lowry sent a letter to OFI and Invesco.  In the letter, Lowry stated that the Sellers "do not consent to the anticipated assignment of Oppenheimer's obligations under the SPA to Invesco."

131.    Lowry provided several reasons for the Sellers' unwillingness to consent.  First, Invesco's PowerShares ETFs directly competed with RevenueShares ETFs, with Invesco routinely disparaging the strategies underpinning RevenueShares ETFs.  Second, at that time, Invesco's ETF products held over $230 billion AUM.  RevenueShares ETFs' appeal would be diluted once added to Invesco's much larger offerings.  Finally, the Sellers did not consent to the assignment because

Invesco's acquisition of OFI caused a conflict of interest for Invesco between supporting its own ETFs and fulfilling its obligations under the SPA to support RevenueShares ETFs, at least until the end of the final Earn-Out Period.  All of this directly impacted Plaintiffs' ability to receive the full purchase price through the Earn-Out Payments.

132.    In the letter, Lowry also notified OFI and Invesco that the Sellers did not consent to any action that would result in an assignment of OFI's obligations under the SPA to Invesco, which included OFI's obligations under an earn-out.

133.    OFI replied by letter dated November 16, 2018, asserting that "[a]ll the rights and obligations under the SPA will remain with OFI, both before and after the completion of the Invesco merger."

134.    Similarly, in a letter dated November 19, 2018, Invesco claimed that "there will not be an assignment of the SPA as part of the transaction.  Upon the transaction's consummation, Invesco, through its then wholly owned subsidiary OFI, fully intends to honor the contractual commitments set forth in the SPA."

135.    These assertions were false.

C.    In Violation of the SPA, Invesco Takes Over Management Responsibility for RevenueShares ETFs

136.    On November 2, 2018, Invesco filed a Form N-1A with the SEC to register the ETFs it was to acquire from OFI.  The filing named Invesco Exchange-Traded Fund Trust II as the registrant.  Organized in Massachusetts in 2006, this trust formerly did business under the name PowerShares Exchange-Traded Fund Trust.  The advisor to the trust was identified as Invesco

36

Capital Management LLC, a Delaware limited liability company and wholly-owned subsidiary of Invesco.  Invesco filed the Form N-1A to register OFI's ETFs under new CUSIP numbers and fund names.  Thus, contrary to the statements in the November 16, 2018 and November 19, 2018 letters, these filings reflected Invesco's assumption of control over RevenueShares ETFs.

137.    The Form N-1A also set forth the managerial changes to RevenueShares ETFs. This filing named Invesco Capital Management LLC as the new investment advisor to each RevenueShares ETF.  The new portfolio managers were all Invesco employees, with none of the OFI portfolio managers retaining their positions.  Plainly, OFI was no longer in charge of managing RevenueShares ETFs.

138.    Further, the Form N-1A provided that Invesco entered into several new agreements for RevenueShares ETFs, including new licensing agreements with index sponsors and new agreements with the funds' custodian.  These changes took effect 75 days after the filing of the Form N-1A.

139.    During the period between September 2018, when it was first announced publicly that Massachusetts Mutual Life Insurance Company was interested in selling OFI, through the end of 2018, the actions and omissions of OFI and Invesco prompted liquidation by investors who feared that Invesco would close the ETFs or who grew concerned with the absence of communication from the salesforce for their funds.  From Q3 2018 to Q4 2018, RevenueShares ETFs' AUM decreased from $3,001,306,941 to $2,944,139,384.

PHIL1 8756106v.1

140.   On December 20, 2018, Lowry, as Seller Representative, again provided OFI and Invesco with written notice that he "[did] not consent to the transfer and control of the business to Invesco, as is contemplated by the Invesco Merger Agreement and the Form N-1A."

141.   On February 13, 2019, OFI sent out proxy materials to gain shareholder approval for the Invesco transaction.  The proxy materials provided notice of a joint special meeting of shareholders on April 12, 2019.

142.   The proxy materials also informed shareholders of the details regarding the transaction with Invesco.  Specifically, the materials requested that shareholders vote that each of OFI's ETFs reorganize "into a corresponding, newly formed fund in the Invesco family of funds."

143.   The proxy materials also stated that due to the reorganization, OFI would transfer its assets from OFI into the acquiring Invesco funds.  As part of the merger, Invesco changed RevenueShares ETFs' names and CUSIP numbers as detailed in the chart below:

| VTL ETF | CUSIP | OFI ETF | CUSIP | Invesco ETF | CUSIP |
|---|---|---|---|---|---|
| RevenueShares Large Cap Fund (RWL) | 761396100 | Oppenheimer S&P 500 Revenue ETF | 68386C104 | Invesco S&P 500 Revenue ETF | 46138G698 |
| RevenueShares Financials Sector Fund | 761396506 | Oppenheimer S&P Financial Revenue ETF | 68386C807 | Invesco S&P Financials Revenue ETF | 46138G680 |
| RevenueShares Mid Cap Fund (RWK) | 761396209 | Oppenheimer S&P MidCap 400 Revenue ETF | 68386C203 | Invesco S&P MidCap 400 Revenue ETF | 46138G672 |
| RevenueShares Small Cap Fund (RWJ) | 761396308 | Oppenheimer S&P SmallCap 600 Revenue ETF | 68386C302 | Invesco S&P SmallCap 600 Revenue ETF | 46138G664 |

PHIL1 8756106v.1

| RevenueShares Ultra Dividend Fund (RDIV) | 761396886 | Oppenheimer S&P Ultra Dividend Revenue ETF | 68386C401 | Invesco S&P Ultra Dividend Revenue ETF | 46138G656 |
|---|---|---|---|---|---|
| N/A | N/A | Global ESG Revenue ETF (ESGF) | 68386C781 | Invesco Global ESG Revenue ETF | 46138G813 |
| N/A | N/A | Global Revenue ETF (RGLB) | 68386C765 | Invesco Global Revenue ETF | 46138G797 |
| N/A | N/A | International Revenue ETF (REFA) | 68386C757 | Invesco International Revenue ETF | 46138G789 |
| N/A | N/A | Emerging Markets Revenue ETF (REEM) | 68386C864 | Invesco Emerging Markets Revenue ETF | 46138G899 |
| N/A | N/A | International Ultra Dividend Revenue ETF (RIDV) | 68386C732 | Invesco International Ultra Dividend Revenue ETF | 46138G7714 |
| N/A | N/A | Emerging Markets Ultra Dividend Revenue ETF (REDV) | 68386C740 | Invesco Emerging Markets Ultra Dividend Revenue ETF | 46138G821 |
| N/A | N/A | ESG Revenue ETF (ESGL) | 68386C773 | Invesco ESG Revenue ETF | 46138J627 |

144.    On May 24, 2019, the acquisition and merger between Invesco and OFI closed. Based on the acquisition's structure, Invesco became the successor of OFI by operation of law.

145.    On July 30, 2019, an accounting executive at Invesco, rather than at OFI, provided Lowry with the contractually required Net ETF Revenue report for the period from April 1, 2019 to June 20, 2019.

146.    As part of the OFI acquisition, Invesco set a "cost savings synergy target" of $475 million.  To achieve this target, Invesco needed to find ways to reduce costs.  A large cost for Invesco was the remaining two Earn-Out Payments and the Final Catch-Up Earn-Out Payment

39

under the SPA.  These additional Earn-Out Payments would cost Invesco $24.6 million.  Invesco needed RevenueShares ETFs to underperform to reduce this cost.  Invesco's ownership of both RevenueShares ETFs and Invesco's much larger ETFs incentivized it to market and promote Invesco's legacy ETFs over RevenueShares ETFs.  By ceasing support for RevenueShares ETFs while supporting new inflows of assets to its own legacy products, Invesco stood to increase its overall revenues while reducing or eliminating altogether a $24.6 million liability to Plaintiffs.

## V.   The Actions of Invesco and OFI Since the Announcement of the Merger Have Damaged the Performance of RevenueShares ETFs

147.   As already explained in detail above, Lowry chose OFI as the purchaser of VTL because OFI met all the criteria VTL needed in a strategic buyer.  These included, but were not limited to:

> (a)   OFI's product portfolio did not contain any revenue-weighted ETFs that could compete with RevenueShares ETFs; and

> (b)   OFI was the long-term beneficiary of RevenueShares ETFs and thus motivated to ensure the funds succeeded.

148.   At the time he entered into the SPA, Lowry reasonably believed that, based on his projections, if OFI managed RevenueShares ETFs through the end of the last Earn-Out Period, the Sellers would receive the full amount of the Earn-Out Payments.  Lowry knew that based on the performance of RevenueShares ETFs and their growth calculations, if OFI managed RevenueShares ETFs, then the Sellers would receive their full Earn-Out Payments.

149.   The SPA contained two provisions to protect the Sellers' receipt of their full Earn-Out Payments – Sections 15.1 and 10.2.

40

A.  Breach of the Anti-Assignment Provision of the SPA

150.    Pursuant to Section 15.1 of the SPA, "no party hereto shall assign this Agreement or any rights or obligations hereunder without the written consent of the other parties hereto and any such assignment without such prior written consent shall be void and of no force and effect." Ex. A at § 15.1.

151.    Section 15.1 also provides: "the Buyer may assign its rights hereunder to an Affiliate of the Buyer or any subsequent purchaser of the Company; provided, further, that no such assignment shall reduce or otherwise vitiate any of the obligations of the Buyer hereunder." *Id.*

152.    Section 15.1 permits OFI to assign its rights under the SPA, but OFI must still fulfill its obligations.

153.    OFI assigned its obligations under the SPA as evidenced by the following actions:

(a)    On October 24, 2018, Invesco filed a Form 10-Q with the Invesco-OFI Merger Agreement attached.  The Invesco-OFI Merger Agreement outlined OFI's assignment of its management obligations to RevenueShares ETFs. Section 5.3 provided that OFI shall obtain all required consents and approvals for the merger of OFI's funds into Invesco's funds.  This section also stated that OFI shall obtain the required approvals for a new advisory contract between its funds and Invesco.  Section 2.1 of this agreement provided that the separate corporate existence of OFI ceased once the transaction closed.  Further, Sections 2.10 and 2.11 of the Invesco-OFI Merger Agreement provided that OFI's directors and officers would no longer manage RevenueShares ETFs.

(b)    On October 31, 2018, Sellers provided Invesco and OFI with written notice that they did not consent to the assignment of OFI's obligations under the SPA.  On November 16, 2018, OFI responded that "there actually will be no assignment of the SPA as part of the Invesco merger."  On November 19, 2018, Invesco responded that it "fully intends to honor the contractual commitments set forth in the SPA." These representations were false, as revealed by subsequent actions taken by Invesco and OFI.

41

(c)    On November 2, 2018, Invesco filed a Form N-1A registering OFI's ETF portfolio under its ETF trust.  The Form N-1A also named Invesco as the investment advisor to RevenueShares ETFs.  In addition, the Form N-1A named the Director and Vice President of the Invesco Exchange Trust-II as the portfolio manager for all RevenueShares ETFs.  Further, only Invesco's employees were responsible for the daily management of the funds' portfolio.

(d)    On December 20, 2018, after reviewing these additional public disclosures, Lowry, as Seller Representative, again notified Invesco and OFI that the Sellers did not consent to OFI assigning its obligations under the SPA to Invesco.

(e)    Despite Lowry's objections, OFI and Invesco proceeded to consummate a merger.  On May 24, 2019, Invesco completed its acquisition of OFI from Massachusetts Mutual Life Insurance Company.  Effective after the close of business on May 24, 2019, OFI reorganized its ETFs into Invesco's ETF portfolio.  As a result, OFI no longer existed as a corporate entity.

154.    These actions, among others, establish that OFI assigned its contractual obligations to Invesco in-fact, and Invesco is OFI's successor by merger as a matter of law.

B.    Breach of the Obligations Not to Take or Omit to Take Any Action for the Purpose of Reducing or Eliminating the Amount of, or Reducing the Probability of Receipt of, any Earn-Out Payment

155.    Section 10.2(a) provides that as part of OFI's management obligations OFI "shall not take or omit to take any action for the purpose of reducing or eliminating the amount of, or reducing the probability of receipt of, any Earn-Out Payment."  *Id.* at § 10.2(a).  OFI and Invesco, as OFI's successor by merger, took action in their management of RevenueShares ETFs to reduce the amount of, and the probability of receipt of, the Sellers' Earn-Out Payments.  These actions and omissions included:

(a)    **Invesco liquidated several RevenueShares ETFs.**  On December 13, 2019, Invesco issued a press release announcing that it was liquidating all RevenueShares ETFs in 2020,

42

except for RWL, RWK, RWJ, and RDIV.  The funds Invesco closed managed over $134 million in assets.  As of market close on February 26, 2020, the closing ETFs no longer traded on an Exchange.  Further, in a letter dated January 6, 2020, Invesco advised Plaintiffs that the closure of these funds would "redirect interest to and increase the performance of Invesco's remaining ETF products, including the four legacy VTL products you reference (*i.e.*, RWL, RWK, RWJ, and RDIV)."  Yet, since Invesco's press release, RevenueShares ETFs lost $217 million AUM and $975,000 in annualized revenue.  As a result, the Sellers' upcoming Third Earn-Out Payment will decrease by at least $1.6 million.

(b) **Invesco directed customers away from RevenueShares ETFs.**  Invesco directed customers away from RevenueShares' RDIV ETF and towards its legacy high-dividend ETF, SPHD.  Prior to Invesco's acquisition of OFI, RDIV was a five-star rated ETF with strong performance relative to its peers.  RDIV was also one of the top performing RevenueShares ETFs.  Under Invesco's management, RDIV directly competed with SPHD.  While RDIV outperformed SPHD, during 2019, RDIV still suffered $250 million in outflows and SPHD earned $250 million in inflows.  Tellingly, RDIV was one of the few ETFs on the market that reported negative outflows during that period.  Following Invesco's acquisition of OFI, no other two funds recorded similar performance dispersions.  Notably, from May 24, 2019 through the date of this Complaint's filing, RDIV lost approximately $361,443,950 AUM.

(c) **Invesco caused RWL to suffer negative outflows.**  Invesco's management of RevenueShares ETFs caused RWL to suffer uncharacteristic levels of negative outflows.  Prior to

43

Invesco's acquisition, RWL was a five-star rated ETF with strong performance relative to its peers. From May through October 2019, RWL outperformed Invesco's corresponding iShares Core S&P 500 ETF, IVV.  Yet, during this time, RWL suffered $32 million in negative outflows while IVV gained over $5 billion in net inflows.  From May 24, 2019 through the date of filing this Complaint, RWL suffered approximately $67,016,600 in negative outflows.  Since the Invesco-OFI Merger Agreement closed, RWL's AUM and net revenues have decreased each quarter.

(d)     **Invesco did not generate growth for RDIV.**  Invesco did not take action to generate growth for RevenueShares RDIV ETF.  After the acquisition, Invesco liquidated some of RDIV's funds.  RDIV recorded 149 million redemption units.  Invesco's corresponding ETF, SPHD, contemporaneously recorded 151 million creation units.  In a letter dated November 8, 2019, Invesco admitted to this activity stating, "creation activity and redemption activity on the whole has skewed towards greater redemptions, resulting in an overall decline in the reported net flows for RDIV."  While RDIV recorded some creation units, 90% of them were the result of rebalances.  The rebalances did not add or detract any value from the ETF.

(e)     **Invesco did not market or promote RevenueShares ETFs.**  Invesco took no steps in promoting or marketing RevenueShares ETFs to expand their distribution.  Invesco provided no incentives for its sales and marketing teams to promote RevenueShares ETFs.  Invesco also did not provide adequate training for its sales teams to address investors' concerns or interests in RevenueShares ETFs.  Rather, Invesco stated that liquidating RevenueShares ETFs enabled its distribution team to focus on Invesco's larger, legacy funds.

44

156.     From the time that OFI began looking for a strategic buyer through the date of filing this Complaint, OFI and Invesco's intentional actions and inactions decreased RevenueShares ETFs' net flow.  A graph illustrating RevenueShares ETFs' negative net flows due to OFI and Invesco's misconduct is set forth below:



157.     This decrease in net flows impeded RevenueShares ETFs' growth.  From May 24, 2019 until the date of filing this Complaint, the funds lost over $682 million AUM.

158.     As detailed above, Defendants are responsible for the amount Sellers' Earn-Out Payments decreased as a result of their improper conduct.  By the end of the final Earn-Out Period, the Sellers estimate that they will have lost in excess of $10 million in earnings that they would have received but for Defendants' intentional actions and inactions.

**VI.     First Earn-Out Payment**

159.     On January 24, 2019, Lowry, as Seller Representative, received the First Earn-Out Payment for the period of January 1, 2018 through and including December 31, 2018.  Based on the calculations of RevenueShares ETFs' performance and OFI's management of RevenueShares

45

ETFs throughout the entire Earn-Out Period, the Sellers' First Earn-Out Payment would have been $11,666,667.

160.    For the First Earn-Out Payment, however, Lowry and Gompers received $10,384,849, a shortfall of $1,281,818.  Under Exhibit A to the SPA, Lowry was allocated 82% of the First Earn-Out Payment or $8,515,576.18.  Gompers was allocated 18% of the First Earn-Out Payment or $1,869,272.82.   Lowry and Gompers' First Earn-Out Payment decreased by $1,281,818 due to Defendants' actions and inactions as alleged above.  But for Defendants' breach of Sections 15.1 and 10.2, Lowry and Gompers would have received $11,666,667 for the First Earn-Out Payment.

## VII.   Second Earn-Out Payment

161.    On January 31, 2020, Lowry, as Seller Representative, received the Second Earn-Out Payment for the period of January 1, 2019 through and including December 31, 2019.

162.    For the Second Earn-Out Payment, Lowry and Gompers received only $9,438,606. In accordance with Exhibit A of the SPA, Lowry was allocated $7,537,156.92 and Gompers was allocated $1,901,449.08.  The Second Earn-Out Payment was short in the amount of $2,228,061 due to Defendants' actions and inactions as alleged above.

## VIII.   Third Earn-Out Payment

163.    Pursuant to the SPA, the Third Earn-Out Period ends on December 31, 2020. Based on RevenueShares ETFs' growth rate prior to the Invesco-OFI Merger Agreement's closing date of May 24, 2019, the Third Earn-Out Payment was on track to reach at least $11,666,667.

PHIL1 8756106v.1

164. Yet, as of the date of the filing of this Complaint, based on the current performance of RevenueShares ETFs, Plaintiffs estimate the Third Earn-Out Payment will not exceed $4.74 million. The Third Earn-Out Payment therefore may end up being nearly $7 million less than $11,666,667 due to Defendants' actions and inactions as alleged above.

165. A graph illustrating the projected decay of the Third Earn-Out Payment Amount is provided below:



To prevent this, Invesco would need to move $3.8 billion AUM into RevenueShares ETFs for the funds to reach their previous projected growth rate.

PHIL1 8756106v.1

IV.     **The Final Catch-Up Earn-Out Payment**

166.    Pursuant to the SPA, the Final Catch-Up Earn-Out Payment may occur at the end of the Third Earn-Out Period.   Based on RevenueShares ETFs' growth rate, prior to the announcement of the OFI-Invesco merger, the Third Earn-Out Revenue Amount was on pace to meet or exceed the Maximum Target Revenue Amount.  The Sellers would have been eligible to receive the Final Catch-Up Earn-Out Payment, and, thus, would have been compensated for the shortfalls in the First and Second Earn-Out Payments.  However, based on RevenueShares ETFs' current performance, the Third Earn-Out Payment Amount is estimated to be no greater than $4.74 million.

167.    As a result, the Sellers no longer appear likely to receive any Final Catch-Up Earn-Out Payment.

## CLAIMS FOR RELIEF

### COUNT I

**Breach of Contract Against Defendant OFI**

168.    Plaintiffs reallege the allegations set forth in the paragraphs above as if set forth fully herein.

169.    Plaintiffs and OFI entered into the SPA, which is a valid and enforceable contract.

170.    Plaintiffs fully performed under the SPA by fulfilling all their obligations.

171.    The SPA prohibited OFI from assigning its contractual obligations without Plaintiffs' written consent.  The SPA also prohibited OFI from taking or omitting to take any action

48

for the purpose of reducing or eliminating the amount of, or reducing the probability of receipt of, any Earn-Out Payment.

172.    Nevertheless, as set forth in greater detail in the factual background of this Complaint, OFI assigned and/or delegated its obligations under the SPA to Invesco.

173.    As set forth in greater detail in the factual background of this Complaint, OFI materially breached the SPA.

174.    OFI further breached the SPA by failing to discharge its management obligations in good faith.

175.    As a direct and proximate result of OFI's material breaches of the SPA, Plaintiffs suffered substantial damages in an amount to be determined at trial, including a reduction in the amount of their First and Second Earn-Out Payments as well as the probability of a substantial reduction in their Third Earn-Out Payment, with no ability to receive a Final Catch-Up Earn-Out Payment.

WHEREFORE, Plaintiffs request that this Court enter judgment in favor of Plaintiffs and against OFI in an amount greater than $75,000.00, along with interest, costs and all other relief this Court deems just and proper.

## COUNT II

### Breach of Contract Against Defendant Invesco

176.    Plaintiffs reallege the allegations set forth in the paragraphs above as if set forth fully herein.

177.    Plaintiffs and OFI entered into the SPA, which is a valid and enforceable contract.

178.    Plaintiffs fully performed under the SPA by fulfilling all of their obligations.

179.    The SPA prohibited OFI from assigning its contractual obligations without Plaintiffs' written consent.

180.    Nevertheless, as set forth in greater detail in the factual background of this Complaint, OFI assigned and/or delegated its obligations under the SPA to Invesco.

181.    As set forth in greater detail in the factual background of this Complaint, Invesco materially breached the SPA.

182.    Invesco further breached the SPA by failing to discharge its management obligations in good faith.

183.    Alternatively, Invesco is liable for breaching the SPA as the *alter ego* of OFI, and/or as the *alter ego* of OFI's successor-in-interest, because following the Invesco-OFI Merger Agreement: (i) Invesco exercised complete domination over OFI and/or over OFI's successor-in-interest with respect to the obligations OFI owed Plaintiffs under the SPA; and (ii) Invesco used that domination to commit a wrong upon Plaintiffs.

184.    Invesco is further liable for breaching the SPA as OFI's successor by merger.

185.    As a direct and proximate result of Invesco's misconduct, Plaintiffs suffered substantial damages in an amount to be determined at trial, including a reduction in the amount of their First and Second Earn-Out Payments as well as the probability of a substantial reduction in their Third Earn-Out Payment, with no ability to receive a Final Catch-Up Earn-Out Payment.

PHIL1 8756106v.1

WHEREFORE, Plaintiffs request that this Court enter judgment in favor of Plaintiffs and against Invesco in an amount greater than $75,000.00, along with interest, costs and all other relief this Court deems just and proper.

## COUNT III

**Breach of Implied Covenant of Good Faith and Fair Dealing against Defendant OFI**

186.  Plaintiffs reallege the allegations set forth in the paragraphs above as if set forth fully herein.

187.  Plaintiffs bring this claim in the alternative to Count I.

188.  Plaintiffs and OFI entered into the SPA, which is a valid and enforceable contract.

189.  The SPA contained an implied covenant of good faith and fair dealing in the performance of the contract, which required OFI not to infringe on Plaintiffs' rights to the benefits of the agreement or to deprive Plaintiffs of the benefits of the agreement.

190.  Under the SPA, Plaintiffs were entitled to benefit from the future performance of RevenueShares ETFs in the form of Earn-Out Payments.

191.  As set forth in greater detail in the factual background of this Complaint, OFI breached the implied covenant of good faith and fair dealing incorporated into the SPA by preventing Plaintiffs from receiving the benefit of the SPA by taking action to ensure that the Earn-Out Payments substantially decreased.

192.  OFI further breached the implied covenant of good faith and fair dealing incorporated into the SPA by failing to take action that would increase the probability of receipt of Plaintiffs' Earn-Out Payments.

51

PHIL1 8756106v.1

193.     Due to Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs suffered substantial financial harm in an amount to be determined at trial, including being deprived of their full Earn-Out Payments, which would have been much higher if OFI performed its obligations in accordance with the SPA.

WHEREFORE, Plaintiffs request that this Court enter judgment in favor of Plaintiffs and against OFI in an amount greater than $75,000.00, along with interest, costs and all other relief this Court deems just and proper.

## COUNT IV

**Breach of Implied Covenant of Good Faith and Fair Dealing against Defendant Invesco**

194.     Plaintiffs reallege the allegations set forth in the paragraphs above as if set forth fully herein.

195.     Plaintiffs bring this claim in the alternative to Count II.

196.     Plaintiffs and OFI entered into the SPA, which is a valid and enforceable contract.

197.     The SPA contained an implied covenant of good faith and fair dealing in the performance of the contract, which required OFI not to infringe on Plaintiffs' rights to the benefits of the agreements or to deprive Plaintiffs of the benefits of the agreement.

198.     Under the SPA, Plaintiffs were entitled to benefit from the future performance of RevenueShares ETFs in the form of Earn-Out Payments.

199.     The SPA prohibited OFI from assigning its contractual obligations without Plaintiffs' written consent.

200.     Nevertheless, as set forth in greater detail in the factual background of this Complaint, OFI assigned and/or delegated its obligations under the SPA to Invesco.

201.     As set forth in greater detail in the factual background of this Complaint, Invesco breached the implied covenant of good faith and fair dealing incorporated into the SPA by preventing Plaintiffs from receiving the benefit of the SPA by taking action to ensure that the Earn-Out Payments substantially decreased.

202.     Invesco further breached the implied covenant of good faith and fair dealing incorporated into the SPA by failing to take action that would increase the probability of receipt of Plaintiffs' Earn-Out Payments.

203.     Alternatively, Invesco is liable for breaching the SPA's implied covenant of good faith and fair dealing as the *alter ego* of OFI, and/or as the *alter ego* of OFI's successor-in-interest, because: (i) Invesco exercised complete domination over OFI and/or over OFI's successor-in-interest with respect to the obligations OFI owed Plaintiffs under the SPA; and (ii) Invesco used that domination to commit a wrong upon Plaintiffs.

204.     Invesco is further liable for breaching the SPA's implied covenant of good faith and fair dealing as OFI's successor by merger.

205.     Due to Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiffs suffered substantial financial harm in an amount to be determined at trial, including being deprived of their full Earn-Out Payments, which would have been much higher if Invesco performed its obligations in accordance with the SPA.

WHEREFORE, Plaintiffs request that this Court enter judgment in favor of Plaintiffs and against Invesco in an amount greater than $75,000.00, along with interest, costs and all other relief this Court deems just and proper.

## COUNT V

**Tortious Interference with Contract against Defendant Invesco**

206.    Plaintiffs reallege the allegations set forth in the paragraphs above as if set forth fully herein.

207.    Plaintiffs and OFI entered into the SPA, which is a valid and enforceable contract.

208.    At all relevant times, Invesco knew: (i) of the SPA and its terms, including, but not limited to sections 10.2 and 15.1; (b) that OFI could not assign and/or delegate its obligations under the SPA without Plaintiffs' written consent; (c) that as part of those duties OFI could not take or omit to take any action that reduced the amount of the Earn-Out Payments, or reduced the probability of receipt of the Earn-Out Payments; (d) that Plaintiffs did not consent to the assignment and/or delegation; and (e) that under the Invesco-OFI Merger Agreement, it could not be indemnified for the Earn-Out Payments.

209.    Invesco tortiously interfered with Plaintiffs' contractual relationship with OFI, without justification, by inducing OFI to breach the SPA through the Invesco-OFI Merger Agreement and/or by accepting OFI's assignment and/or delegation of its contractual obligations under the SPA without Plaintiffs' written consent.

PHIL1 8756106v.1

210.   Invesco's tortious interference resulted in a breach of the SPA as OFI assigned and/or delegated its contractual obligations to Invesco without Plaintiffs' written consent and Invesco's intentional actions and inactions substantially reduced Plaintiffs' Earn-Out Payments.

211.   Invesco failed to act in good faith in performance of the duties assigned and/or delegated to it from OFI.

212.   Alternatively, if it is determined that OFI did not assign or delegate its obligations under the SPA to Invesco, Invesco is still liable for tortious interference because by entering into the Invesco-OFI Merger Agreement, and/or by its actions and inactions after the closing of that transaction, Invesco proximately caused the breach of section 10.2(a) of the SPA.

213.   Invesco took the foregoing actions to interfere purposefully with Plaintiffs' contract with OFI causing an injury to Plaintiffs in an amount to be determined at trial.

214.   Invesco's conduct was malicious, willful, and/or wanton, and without justification, and Plaintiffs are entitled to an award of damages in an amount to be determined at trial.

215.   But for Invesco's tortious interference, the SPA would not have been breached.

216.   Plaintiffs' damages include, but are not limited to, the Earn-Out Payment amounts RevenueShares ETFs would have earned if Invesco had not interfered.

WHEREFORE, Plaintiffs request that this Court enter judgment in favor of Plaintiffs and against Invesco in an amount greater than $75,000.00, along with punitive interest, costs and all other relief this Court deems just and proper.

55

## COUNT VI

### Breach of Contract against Defendant MMAM

217.   Plaintiffs reallege the allegations set forth in the paragraphs above as if set forth fully herein.

218.   Plaintiffs and OFI entered into the SPA, which is a valid and enforceable contract.

219.   As set forth above, OFI materially breached the SPA.

220.   Oppenheimer Acquisition Corporation was the holding company for OFI.

221.   MMAM was the holding company for Oppenheimer Acquisition Corporation.

222.   MMAM was the ultimate parent company of OFI prior to the Invesco-OFI Merger Agreement.

223.   MMAM was a party to the Invesco-OFI Merger Agreement.

224.   At all relevant times, MMAM knew: (i) of the SPA and its terms, including, but not limited to sections 10.2 and 15.1; (b) that OFI could not assign and/or delegate its obligations under the SPA without Plaintiffs' written consent; (c) that as part of those duties OFI could not take or fail to take any action that reduced the amount of the Earn-Out Payments, or reduced the probability of receipt of the Earn-Out Payments; and (d) that Plaintiffs did not consent to the assignment and/or delegation.

225.   By entering into the Invesco-OFI Merger Agreement, MMAM caused OFI to assign and/or delegate its obligations under the SPA to Invesco, without Plaintiffs' written consent, which was a material breach of the SPA.

56

226.    MMAM is liable for breaching the SPA because at the time MMAM entered into the Invesco-OFI Merger Agreement it was acting as OFI's *alter ego*, given that: (i) MMAM exercised complete domination over OFI with respect to the obligations OFI owed Plaintiffs under the SPA; and (ii) MMAM used that domination to commit a wrong upon Plaintiffs.

227.    As a direct and proximate result of MMAM's misconduct, Plaintiffs suffered substantial damages in an amount to be determined at trial, including a reduction in the amount of their First and Second Earn-Out Payments as well as the probability of a substantial reduction in their Third Earn-Out Payment, with no ability to receive a Final Catch-Up Earn-Out Payment.

WHEREFORE, Plaintiffs request that this Court enter judgment in favor of Plaintiffs and against MMAM in an amount greater than $75,000.00, along with interest, costs and all other relief this Court deems just and proper.

## COUNT VII

### Tortious Interference with Contract against Defendant MMAM

228.    Plaintiffs reallege the allegations set forth in the paragraphs above as if set forth fully herein.

229.    Plaintiffs bring this claim in the alternative to Count VI.

230.    Plaintiffs and OFI entered into the SPA, which is a valid and enforceable contract.

231.    Oppenheimer Acquisition Corporation was the holding company for OFI.

232.    MMAM was the holding company for Oppenheimer Acquisition Corporation.

233.    MMAM was the ultimate parent company of OFI prior to the Invesco-OFI Merger Agreement.

57

234.    MMAM was a party to the Invesco-OFI Merger Agreement.

235.    At all relevant times, MMAM knew: (i) of the SPA and its terms, including, but not limited to sections 10.2 and 15.1; (b) that OFI could not assign and/or delegate its obligations under the SPA without Plaintiffs' written consent; (c) that as part of those duties OFI could not take or omit to take any action that reduced the amount of the Earn-Out Payments, or reduced the probability of receipt of the Earn-Out Payments; and (d) that Plaintiffs did not consent to the assignment and/or delegation.

236.    MMAM tortiously interfered with Plaintiffs' contractual relationship with OFI, without justification, by inducing OFI to breach the SPA through the Invesco-OFI Merger Agreement and for the consideration received by its wholly-owned subsidiary, OFI, as well as the consideration MMAM received in the merger with Invesco.

237.    MMAM's tortious interference resulted in a breach of the SPA because OFI assigned and/or delegated its contractual duties to Invesco without Plaintiffs' written consent and Invesco's intentional actions and inactions substantially reduced Plaintiffs' Earn-Out Payments.

238.    Alternatively, if it is determined that OFI did not assign or delegate its obligations under the SPA to Invesco, MMAM is still liable for tortious interference because by entering into the Invesco-OFI Merger Agreement, MMAM proximately caused the breach of section 10.2(a) of the SPA.

239.    Within the Invesco-OFI Merger Agreement, MMAM knowingly allowed its wholly-owned subsidiary, Oppenheimer Acquisition Corporation, to represent and warrant falsely

58

that OFI was not a party to or bound to any contract relating to the acquisition of a business with remaining obligations to an "earn-out."

240.    Upon information and belief, within the Invesco-OFI Merger Agreement, MMAM knowingly allowed its wholly-owned subsidiary, Oppenheimer Acquisition Corporation, to represent and warrant falsely that OFI was not in material breach or default of any material contract and that no event had occurred that would constitute a material breach or default.

241.    MMAM took the foregoing actions to interfere purposefully with Plaintiffs' contract with OFI causing an injury to Plaintiffs in an amount to be determined at trial.

242.    MMAM's conduct was malicious, willful, and/or wanton, and without justification, and Plaintiffs are entitled to an award of damages in an amount determined at trial.

243.    But for MMAM's tortious interference, the SPA would not have been breached.

244.    As a direct and proximate result of MMAM's misconduct, Plaintiffs suffered substantial damages in an amount to be determined at trial, including a reduction in the amount of their First and Second Earn-Out Payments as well as the probability of a substantial reduction in their Third Earn-Out Payment, with no ability to receive a Final Catch-Up Earn-Out Payment.

WHEREFORE, Plaintiffs request that this Court enter judgment in favor of Plaintiffs and against MMAM in an amount greater than $75,000.00, along with punitive interest, costs and all other relief this Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

59

Dated: March 13, 2020

**KLEHR HARRISON HARVEY
  BRANZBURG** LLP

By: s/ *Paige M. Willan*
Paige M. Willan (N.Y. Bar No. 4745303)
5 Penn Plaza, 23rd Floor
New York, NY 10001
Telephone: (332) 600-5580
Facsimile: (332) 600-7230
pwillan@klehr.com

        -and-

Michael K. Coran (*pro hac vice* forthcoming)
William T. Hill (*pro hac vice* forthcoming)
Stephanie M. Grey (*pro hac vice* forthcoming)
KLEHR HARRISON
HARVEY BRANZBURG LLP
1835 Market Street, Suite 1400
Philadelphia, PA 19103
Telephone: (215) 569-2700
Facsimile: (215) 568-6603
mcoran@klehr.com
whill@klehr.com
sgrey@klehr.com

*Counsel for Plaintiffs*

60