UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                :

VINCENT T. LOWRY, et al.,           :
                                :

                Plaintiffs,  :
                                :         20-CV-2288 (VSB)

          -against-       :
                                :       **OPINION & ORDER**

OPPENHEIMERFUNDS, INC., et al.,  :
                                :

                Defendants.  :
                                :
--------------------------------------------------------X

Appearances:

Michael K. Coran
Stephanie Grey
Paige Melanie Willan
Klehr, Harrison, Harvey, Branzburg LLP
Philadelphia, Pennsylvania
*Counsel for Plaintiffs*

Adam Michael Harris
Lisa H. Bebchick
Ropes & Gray, LLP
New York, New York
*Counsel for Defendants Invesco Ltd. and OppenheimerFunds, Inc.*

David Adam Kotler
Hayoung Park
Dechert LLP
New York, New York
*Counsel for Defendant MM Asset Management Holding LLC*

VERNON S. BRODERICK, United States District Judge:

       Plaintiffs Vincent T. Lowry ("Lowry") and Joseph N. Gompers ("Gompers") (together,

"Plaintiffs") allege in their Complaint, (Doc. 1 ("Compl.")), that they entered into a Sale and

Purchase Agreement, (*see* Doc. 1-1 ("SPA")), with Defendant OppenheimerFunds, Inc. ("OFI")

when Defendant MM Asset Management Holding LLC ("MM") was OFI's indirect parent

1

company, and they allege that the actions by Defendant Invesco, Ltd. ("Invesco") after acquiring OFI, as well as MM's actions in the course of selling OFI to Invesco, breached the SPA. Currently before me are two motions to dismiss filed by Defendants MM, OFI, and Invesco (collectively, "Defendants").  Because Plaintiffs have plausibly alleged that OFI and Invesco breached the SPA, but not that OFI and Invesco are alter-egos, OFI and Invesco's motion to dismiss is GRANTED IN PART and DENIED IN PART.  Because Plaintiffs fail to plead that MM acted with the requisite intention to support its claims, MM's motion to dismiss is GRANTED.

## I.     <u>Factual Background</u>[1]

In 2004, Lowry founded VTL Associates, LLC ("VTL"), an investment and wealth management consulting firm.  (Compl. ¶ 29.)  VTL offered various securities products, including exchange-traded funds ("ETFs") that indexed securities based on revenue, rather than in the more typical fashion of indexing by market capitalization.  (*Id.* ¶¶ 35, 53–54).  From around 2013 through 2015, certain of VTL's ETFs "consistently outperformed its benchmark market capitalization-weighted index on both a calendar year and rolling 3-year basis." (*See id.* ¶¶ 63–65).  As of February 2015, one of VTL's ETFs had around $1.04 billion total assets under management.  (*Id.* ¶ 64.)

---

[1] The following facts are taken from the Complaint, the SPA, and other publicly-filed materials, including various exhibits.  I assume the factual allegations set forth in the Complaint, and in the various exhibits, to be true for purposes of this motion.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. . . . Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." (internal quotations and citations omitted)); *see* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").  My references to these facts should not be construed as a finding as to their veracity, and I make no such findings.

Sometime in 2015, Lowry began looking to selling VTL.  (*See id.* ¶¶ 72, 77–78.)  He wanted VTL's eventual buyer to have the resources to help VTL expand, and he did not want a buyer that competed with VTL's ETFs through its own investment products.  (*Id.* ¶¶ 72–75.)  Lowry chose OFI as "the bidder most qualified to meet [his] vison and VTL's needs for future growth," as well as because "OFI's portfolio did not include any ETFs" or other "products" that "directly competed with" VTL's revenue-weighted ETFs.  (*Id.* ¶ 76.)  At the time, MM was OFI's indirect parent company.  (*Id.* ¶ 222.)  MM owned Oppenheimer Acquisition Corporation ("OAC"), which in turn was the holding company for OFI.  (*Id.* ¶ 25.)

On September 4, 2015, Plaintiffs, VTL, and OFI executed the SPA, and the transaction closed on December 2, 2015.  (*Id.* ¶¶ 77–78.)  Under the SPA, OFI acquired VTL, and Plaintiffs were to be paid a fixed amount of money at closing, plus additional "Earn-Out Payments."  (*Id.* ¶ 79.)  These Earn-Out Payments were to be paid after successive intervals of time and would be based on how VTL's ETFs performed going forward, with the first Earn-Out Payment due three years following the SPA's closing.  (*Id.* ¶¶ 82–89.)  The point of a mechanism like these "Earn-Out Payments" is to align the interests of the parties to a deal for the sale of a business—if the business does better after sale, its buyer is benefited, and its seller receives more money as a result of having sold a well-functioning business.  (*See id.* ¶ 81.)

In negotiating the SPA, Plaintiffs "agreed to defer more than forty percent of" what they would otherwise have been paid in cash to these later-paid "Earn-Out Payments" "because they were confident in" how VTL's ETFs would perform going forward, and because "OFI did not have a competing ETF business that could potentially divert assets from" the VTL ETFs.  (*Id.* ¶ 90.)  To this end, the SPA contained a clause barring OFI, as "the Buyer," from "tak[ing] or omit[ting] to take any action for the purpose of reducing or eliminating the amount of, or

reducing the probability of receipt of, any Earn-Out Payment," as well as a clause barring "the Buyer" from making any "assignment" that "shall reduce or otherwise vitiate any of the obligations of the Buyer hereunder."  (Compl. ¶¶ 96–97 (quoting SPA §§ 10.2(a), 15.1).)

On October 18, 2018, two months before the period for calculating the first Earn-Out Payment closed, Invesco announced it would acquire OFI from MM's parent company (the "Merger").  (*See id.* ¶¶ 83, 112.)  The Merger was governed by a "Merger Agreement" among Invesco, MM, OAC, and two subsidiaries created to effect the Merger.  (*Id.* ¶ 114.)  The Merger closed on May 24, 2019, and, as part of the Merger Agreement's structure of the transaction, OAC ceased to exist by the time the Merger closed, and OFI either remained a shell entity without assets or operations, or it also ceased to exist.[2]  (*Id.* ¶¶ 117, 153(e); Merger Agreement § 2.1.)[3]

As part of the Merger Agreement, among other things, OAC provided certain warranties about the then-present state of certain of its "Acquired Companies."  In Section 3.8(a), OAC warranted that

> except as set forth in Section 3.8(a) of the Company Disclosure Schedule, none of the Acquired Companies is a party to or bound by . . . any Contract relating to the acquisition or disposition of any business, capital stock or assets of any Person . . . for consideration greater than $500,000 or that has any remaining obligations under any 'earn-out' or other contingent consideration provisions . . . .

(Merger Agreement § 3.8(a).)  OAC also warranted that

> Except as otherwise disclosed in Section 3.8(b) of the Company Disclosure Schedule, no Acquired Company is, and to the Knowledge of the Company, no other party is, in material breach or default of any Material Contract and no event has occurred that . . . would constitute such a material breach or default by any

---

[2] There is a question of fact whether under the Merger Agreement "OFI retained its corporate existence" or whether it ceased to exist and was merged into Invesco or one of Invesco's subsidiaries.  (*See* Doc. 24, at 10 n.5 (collecting the competing accounts).)  I need not resolve this issue to resolve the present motion.

[3] The Merger Agreement was filed with the Court as an exhibit to the present motions.  (Doc. 22-1.)

Acquired Company, or to the Knowledge of the Company, any other party thereto.

(*Id.* § 3.8(b).)  The "Company Disclosure Schedule" was never made public, (Compl. ¶ 125), and

OAC and OFI both knew that OFI was required to make the remaining Earn-Out Payments due

to Plaintiffs under the SPA, (*id.* ¶ 123).

On October 31, 2018, prior to the Merger, Lowry informed OFI and Invesco that

Plaintiffs "do not consent to the anticipated assignment" or any act that would result in the

assignment of OFI's obligations under the SPA to Invesco.  (Compl. ¶¶ 130–32.)  Unlike OFI,

Invesco did have ETFs that competed with VTL's ETFs, and Plaintiffs were concerned that this

competition might reduce the Earn-Out Payments they were due to receive.  (*See id.* ¶¶ 113, 131,

146.)  OFI responded to Lowry by saying that "all the obligations under the SPA will remain

with OFI."  (*Id.* ¶¶ 133, 135.)

After the Merger Agreement was executed, in early November of 2018, Invesco filed

SEC registration forms in which it named some of its own entities as the new registrant and

investment advisors to the ETFs it acquired from OFI.  (*Id.* ¶¶ 136–37.)  All of the new portfolio

managers were Invesco employees, as none of the prior OFI portfolio managers retained their

positions.  (*Id.* ¶ 137.)  OFI also assigned "management obligations" over the ETFs to Invesco,

(*id.* ¶ 153), and Invesco changed the names and CUSIP numbers for the ETFs to reflect that it,

not OFI, now ran them, (*id.* ¶ 143).  Moreover, according to a joint proxy statement sent to

shareholders of OFI ETFs on February 14, 2019, the Merger meant that "shareholders" who had

held shares of particular OFI ETFs, which had been governed by Delaware law, "will own shares

of an ETF governed by Massachusetts law" due to how Invesco structured the relevant ETFs.

(Doc. 25-1, at 32.)

Additionally, Invesco took a number of steps which allegedly had the effect of reducing the Earn-Out Payments, including: (1) liquidating many of the OFI ETFs; (2) directing customers away from an OFI ETF to its own directly-competing ETF; and (3) failing to provide any financial incentives for its salespeople to promote the OFI ETFs. (Compl. ¶¶ 109, 155.) Plaintiffs plead that these actions were taken in part because Invesco had a "cost savings synergy target" for the Merger, and that "reduc[ing] costs," including the Earn-Out Payments, were ways to reach this target. (*Id.* ¶ 146.)

Plaintiffs plead that MM was aware that the SPA's terms were breached by the Merger. (*Id.* ¶ 235.) The Merger Agreement states that "no Acquired Company is, and to the Knowledge of the Company, no other party is, in material breach or default of any Material Contract and no event has occurred that . . . would constitute such a material breach," save for "as otherwise disclosed in Section 3.8(b) of the Company Disclosure Schedule." (*Id.* ¶ 124 (citation omitted).) As previously mentioned, this Company Disclosure Schedule was not publicly disclosed. (*Id.* ¶ 125.)

Following the Merger, certain ETFs relevant to the Earn-Out Payments lost over $682 million worth of assets under management, which led to Plaintiffs' allegedly receiving millions of dollars less in Earn-Out Payments than they would have otherwise. (*Id.* ¶¶ 156–65.)

## II.   **Procedural History**

Plaintiffs commenced this action by filing their Complaint on March 13, 2020. (Doc. 1.) Plaintiffs plead claims for breach of contract against OFI (Count I); breach of contract against Invesco (Count II); breach of the implied covenant of good faith and fair dealing against OFI (Count III); breach of the implied covenant of good faith and fair dealing against Invesco (Count

IV); tortious interference with contract against Invesco (Count V); breach of contract against

MM (Count VI); and tortious interference with contract against MM (Count VII).

On May 27, 2020, MM filed a motion to dismiss, (Doc. 17), and Invesco and OFI filed a

combined motion to dismiss, (Doc. 20).  On July 24, 2020, Plaintiffs filed briefs opposing each

motion.  (Docs. 24–25.)  Defendants filed reply briefs on September 9, 2020.  (Docs. 33–34.)

### III.   <u>Legal Standard</u>

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007)).  A claim will have "facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Id.*  This standard demands "more than a sheer possibility

that a defendant has acted unlawfully."  *Id*.  "Plausibility . . . depends on a host of considerations:

the full factual picture presented by the complaint, the particular cause of action and its elements,

and the existence of alternative explanations so obvious that they render plaintiff's inferences

unreasonable."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts

alleged in the complaint and must draw all reasonable inferences in the plaintiff's

favor.  *Kassner*, 496 F.3d at 237.  "A complaint is deemed to include any written instrument

attached to it as an exhibit or any statements or documents incorporated in it by reference."

*Nicosia v. Amazon.com, Inc*., 834 F.3d 220, 230 (2d Cir. 2016) (internal quotations and citation

omitted).  A court "may also consider matters of which judicial notice may be taken" in ruling on

a motion to dismiss.  *Staehr v. Hartford Fin. Servs. Grp., Inc*., 547 F.3d 406, 425 (2d Cir. 2008).

A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  Finally, although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

## IV.   <u>Discussion</u>

Plaintiffs seek to hold liable OFI, Invesco, and MM for conduct centering on alleged breaches of the SPA.  I will assess the liability of each Defendant based on the allegations in the Complaint in turn.

### A.   **Claims Against OFI:  Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing**

#### 1.   **Applicable Law**

Under New York law, which governs the SPA pursuant to its choice-of-law clause, (SPA § 15.2), a plaintiff claiming a breach of contract must allege:  "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016) (citation omitted).  A court's primary objective in interpreting a contract "is to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000); *see also Greenwich Capital Fin. Prods., Inc. v. Negrin*, 74 A.D.3d 413, 415 (1st Dep't 2010) (courts are bound to construe the terms of a contract "in a manner that accords the words their fair and reasonable meaning, and achieves a practical interpretation of the expressions of the parties" (internal quotation marks omitted)).

A district court may dismiss a breach of contract claim at the motion-to-dismiss stage only where "the terms of the contract are unambiguous." *Orchard Hill*, 830 F.3d at 156.  A

contract is ambiguous "if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 114 (2d Cir. 2014) (citation omitted).  There is no ambiguity "where the contract language has a definite and precise meaning." *Id.*

Additionally, under New York law, "a covenant of good faith and fair dealing in the course of contract performance" is "[i]mplicit in all contracts." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 631–32 (S.D.N.Y. 2013) (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)); *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 30 N.Y.2d 34, 45 (1972).  The implied covenant of good faith and fair dealing obligates a promisor to fulfill "any promises which a reasonable person in the position of the promisee would be justified in understanding were included" in the contract.  *Dalton*, 87 N.Y.2d at 389 (internal quotation marks omitted) (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978)); *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002) (The duties of good faith and fair dealing "do not imply obligations inconsistent with other terms of the contractual relationship . . . [but] do encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included." (citations and internal quotations omitted)).  Accordingly, implied in every contract is a promise that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (quoting *Dalton*, 87 N.Y.2d at 389) (internal quotation marks omitted); *see also LJL 33rd St. Assocs., LLC v. Pitcairn Properties Inc.*, 725 F.3d 184, 195 (2d Cir. 2013) ("The implied covenant of good faith and fair

dealing bars a party from taking actions 'so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties.'" (quoting *Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991))).  However, the implied covenant arises "only in connection with the rights or obligations set forth in the terms of the contract."  *Paul v. Bank of Am. Corp.*, No. 09–CV–1932 (ENV)(JMA), 2011 WL 684083, at *6 (E.D.N.Y. Feb. 16, 2011); *see also Corazzini v. Litton Loan Servicing LLP*, No. 1:09–CV–0199 (LEK/RFT), 2010 WL 1132683, at *7 (N.D.N.Y. Mar. 23, 2010) ("[T]he implied obligation is in aid and furtherance of other terms of the agreement of the parties." (quoting *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983))), and "cannot create duties that negate explicit rights under a contract," *LJL 33rd St. Assocs.*, 725 F.3d at 195.

## 2.      Application

Plaintiffs cite to two provisions of the SPA that they argue Defendants breached.  First, SPA § 10.2(a) states in relevant part that, after the SPA closes,

> the business of the Company and any Subsidiary shall be managed in the sole and absolute discretion of the Buyer, and (ii) the Buyer shall not take or omit to take any action for the purpose of reducing or eliminating the amount of, or reducing the probability of receipt of, any Earn-Out Payment.

(SPA § 10.2(a).)  Second, SPA § 15.1 states that

> Except as otherwise provided in this Agreement, no party hereto shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other parties hereto and any such attempted assignment without such prior written consent shall be void and of no force and effect; provided, however, that the Buyer may assign its rights hereunder to an Affiliate of the Buyer or any subsequent purchaser of the Company; provided, further, that no such assignment shall reduce or otherwise vitiate any of the obligations of the Buyer hereunder. . . .

(*Id.* § 15.1).  Plaintiffs claim that "OFI assigned its contractual obligations to Invesco" under the SPA in violation of SPA § 15.1, and that Invesco then "purposefully t[ook] actions" to "reduc[e]

10

Plaintiffs' Earn-Out Payments" in violation of SPA § 10.2(a).  (*See* OFI Opp. 10–11.)[4]

As an initial matter, Plaintiffs do not plead that OFI violated section 15.1 of the SPA, because they do not plead facts from which to infer that any "party" to the SPA ever "assign[ed]" it "or any rights or obligations" under it.  Under New York law, which the parties agree governs the issue of whether the SPA was assigned, "although no particular formula is needed to create an assignment . . . there is a need for some 'act or words' that manifest an intent to assign."  *Prop. Asset Mgmt., Inc. v. Chicago Title Ins. Co.*, 173 F.3d 84, 87 (2d Cir. 1999) ("There is no evidence, and PAMI does not claim, that the intent to assign the loan to PAMI was memorialized in a written instrument before August 7, 1995.") (quoting *Miller v. Wells Fargo Bank Intern. Corp.*, 540 F.2d 548, 557 (2d Cir. 1976)).

Plaintiffs' argument appears to be that one can infer the intent to assign the SPA from other assignments OFI made to Invesco.  They argue that, under the Investment Company Act ("ICA") and the Investment Advisers Act of 1940 ("IAA") (together, the "Acts"), ETFs and investment advisory contracts were assigned, and that this "conduct shows [Defendants] intended the Merger to result in an assignment of OFI's SPA obligations regarding the management of the" OFI ETFs.  (OFI Opp. 14–15.)

However, Plaintiffs cite no law suggesting that assignments governed by the Acts can be used to imply an assignment of some related contract.  Perhaps more to the point, Plaintiffs do not cite any authority indicating that New York law allows one to infer an intent to assign contractual obligations from a course of dealings.  The cases Plaintiffs do cite have express, written assignments.  *Leon v. Martinez*, 84 N.Y.2d 83, 89 (1994) (the writing of "the words 'I

---

[4] "OFI Opp." refers to Plaintiffs' Memorandum of Law in Opposition to Oppenheimerfunds, Inc. and Invesco LTD.'s Motion to Dismiss.  (Doc. 24.)

give' in the instrument are sufficient to withstand a pleadings challenge as to whether the parties intended to effect a present transfer of the specified percentages of the personal injury recovery"); *Aini v. Sun Taiyang Co.*, 964 F. Supp. 762, 778 (S.D.N.Y. 1997) ("there are at least two possible constructions of the prospective contract language," and one "could have been intended to mean, in substance, that the assignment" had occurred), *aff'd sub nom. Topiclear Beauty v. Sun Taiyang Co.*, 159 F.3d 1348 (2d Cir. 1998).  Plaintiffs point to no language in the Merger Agreement from which one can infer an intent to assign the SPA at all.

Plaintiffs' argument about inferring assignment is further undercut by the Merger Agreement's text.  The Merger Agreement contains a clause indicating that the Merger "Agreement," along with the various ancillary agreements expressly incorporated into it, "constitutes the entire agreement of the parties."  (Merger Agreement § 10.2.)  The Merger Agreement is thus "an integrated agreement," meaning that "the parol evidence rule . . . bars its terms from being 'varied' by extrinsic evidence."  *NRW, Inc. v. Bindra*, 775 Fed. App'x 22, 24 (2d Cir. 2019) (citing, among others, *Primex Int'l Corp. v. Wal-Mart Stores*, 89 N.Y.2d 594, 599–600 (1997)).  Here, there are provisions of the Merger Agreement expressly providing for assignments as part of the Merger.  (*See, e.g.*, Merger Agreement § 5.3(a)(ii) ("For the avoidance of doubt, (i) the Investment Company Advisory Agreement of each U.S. Company Fund shall be assigned to Buyer").)  Plaintiffs' argument would require using a course of dealings as parol evidence to "vary the terms of" the Merger Agreement as they pertain to assignments, and as such it cannot be maintained.  *Bindra*, 775 Fed. App'x at 24.[5]

---

[5] A lack of assignment is also consistent with OFI's November 16, 2018 representation to Lowry that "all rights and obligations under the SPA will remain with OFI, both before and after the completion of the Invesco merger." (Compl. ¶ 133.)  Plaintiffs assert that this "assertion[] w[as] false," (*id.* ¶ 135), but this is conclusory, and Plaintiffs do not plead "factual content that allows the court to draw the reasonable inference that" OFI did assign the SPA. *Cf. Iqbal*, 556 U.S. at 678.

With that said, Plaintiffs have pleaded sufficient facts to support an inference that OFI—

or OFI's successor if OFI no longer exists[6]—breached section 10.2(a) of the SPA, which

provides that OFI "shall not take or omit to take any action for the purpose of reducing . . . any

Earn-Out Payment." (SPA § 10.2(a).) After it acquired OFI, Invesco allegedly directed that

specific actions be taken "for the purpose of reducing the Earn-Out Payments" and to

"increase[e] [Invesco's] own profits." (OFI Opp. 16 (citations omitted)). In particular, Plaintiffs

allege that Invesco directed these actions to satisfy a "cost savings synergy target" for the

Merger, and that Invesco sought to "reduce costs" that included the "Earn-Out Payments" that

would otherwise "cost Invesco $24.6 million." (*See* Compl. ¶ 146.) At this stage, given that I

must "draw all reasonable inferences in favor of" Plaintiffs, I find that the Complaint's

allegations about steps taken in pursuit of the "cost savings synergy target" support a plausible

inference that OFI—or its successor, *see supra*—breached the SPA with the requisite purpose.[7]

Defendants' counterarguments are unavailing at this stage of the litigation on their Rule

12(b)(6) motion. Largely, they say that Plaintiffs cannot "refute the 'obvious alternative

explanation[s]'" for the actions Invesco took that allegedly caused Plaintiffs to receive lower

---

[6] "Upon a merger between two (or more) corporations, each of the merger partners is deemed to survive in the merged entity, and the surviving entity is therefore liable for the liabilities of the corporations that joined in the merger." *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 155 (2d Cir. 2019). Indeed, the SPA states that it "shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties" to it. (SPA § 15.1.)

[7] Plaintiffs' pleadings do not establish which entity is now bound by the SPA's obligations. (*See* Compl. ¶¶ 116–17 (stating that OFI's holding company was sold to Invesco and that the holding company was merged into an entity called "Gem Acquisition Two Corporation"), 118 (stating that Invesco named "OFI" as a "wholly-owned subsidiary[y]" after the Merger), 133 (OFI's response to Lowry's letter stating that "'all the obligations under the SPA will remain with OFI'"), 144 (stating, without supporting facts, that "Invesco became the successor of OFI by operation of law.").) If discovery reveals that OFI was dissolved and has a successor, Plaintiffs will need to assess what steps, if any, might be appropriate, including seeking to make a substitution motion pursuant to Rule 25(c) to have that entity substituted into this action as the defendant for purposes of the breach of contract claim. *See Organic Cow, LLC v. Ctr. For New England Dairy Compact Rsch.*, 335 F.3d 66, 71 (2d Cir. 2003) (providing standard for Rule 25(c) motions premised on being a successor in interest).

Earn-Out Payments and which were taken for this purpose.  (*See* OFI Reply 10 (quoting *Iqbal*, 556 U.S. at 682).)[8]  However, at this stage, Plaintiffs' "allegations . . . clear the bar of plausibility" because they support an inference of Invesco's purpose with a "motive" for "increased profits."  *Cf. Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016).

Having said this, there may be some "common sense" issues with Plaintiffs' theory of the case, since it requires one to believe that OFI and Invesco took steps to undermine their own business for "the purpose of reducing or eliminating . . . or reducing the probability of receipt of" Earn-Out Payments within the meaning of SPA § 10.2(a).  Discovery may reveal that the facts and numbers do not add up to demonstrate that OFI and Invesco profited from their actions and acted with the purpose to reduce or eliminate Earn-Out Payments.[9]  However, "the record is undeveloped" as to what motivations, economic or otherwise, Invesco may have had for how it went about managing its ETFs after the Merger, so I must leave these issues to be "analyzed at later stages of the litigation."  *Gelboim*, 723 F.3d at 783.

Because I find that the breach of contract claim against OFI may proceed, the breach of the implied covenant claim against OFI is dismissed, as it is only pleaded in the alternative. (Compl. ¶ 187.)

### B.  *Invesco's Liability*

Plaintiffs have not pleaded facts showing that the SPA was assigned to Invesco, nor have they pleaded facts showing that some other mechanism would render Invesco liable as their

---

[8] "OFI Reply" refers to the Reply Memorandum of Law in Further Support of Motion to Dismiss of Oppenheimerfunds, Inc. and Invesco Ltd.  (Doc. 34.)

[9] For example, the first Earn-Out Payment was below the maximum but was calculated based on financial metrics in calendar year 2018, (Compl. ¶ 83)—apparently before Invesco directed that actions be taken to reduce the Earn-Out Payments—and the Merger did not close until May of 2019, (*id.* ¶ 114).

counterparty to the SPA.  Accordingly, Invesco cannot be directly liable for breach of the SPA.[10]

Plaintiffs' only remaining theories for Invesco's liability are that its corporate veil should be pierced to render it liable under the SPA, (OFI Opp. 23), and that it tortiously interfered with the SPA, (*id.* at 21).  I will analyze the tortious interference argument first.

### 1.    Tortious Interference with Contract

#### a.    Applicable Law

Under Pennsylvania law, which applies under New York choice-of-law principles given that the locus of Plaintiffs' alleged injury would be felt in their home state of Pennsylvania,[11] a claim for tortious interference with contract requires a plaintiff to "prove four elements:"

> (1) the existence of a contractual relationship or prospective contractual relationship between the plaintiff and another party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship or preventing the relationship from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct.

*BP Env't Servs., Inc. v. Republic Servs., Inc.*, 946 F. Supp. 2d 402, 407 (E.D. Pa. 2013) (citing *Phillips v. Selig*, 959 A.2d 420, 428–29 (Pa. Super. Ct. 2008)).

To satisfy the second element of intent, "[t]he defendant must not only have intended the interference, but must have acted in part at least for the purpose of accomplishing it.'"  *Glenn v. Point Park College*, 272 A.3d 895, 899 (Pa. 1971) (the tort of interference with contract "is an intentional one:  the actor is acting as he does [f]or the purpose of causing harm to the plaintiff").

---

[10] This may need to be reassessed if discovery reveals that Invesco is OFI's successor in liability for purposes of the SPA.  *See supra* nn. 6–7.

[11] *See Am. Lecithin Co. v. Rebmann*, 12-CV-929 (VSB), 2017 WL 4402535, at *19 (S.D.N.Y. Sept. 30, 2017) ("New York courts consider the locus of [the tort of] fraud to be the place where the injury was inflicted and not the place where the fraudulent act originated." (quoting *H.S.W. Enters, Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 142 (S.D.N.Y. 2001)).  In its reply brief, Invesco states that "under Pennsylvania law" or "New York law," the tortious interference analysis should "yield the same result."  (OFI Reply 8 & n.13.)

With regard to the third element, demonstrating an "'absence of privilege or justification on the part of the defendant,' . . . is 'merely another way of stating that the defendant's conduct must be improper' . . . under the circumstances present." *Am. Food & Vending Corp. v. Full Serv. Vending Co.*, No. 3:10CV2576, 2011 WL 2632798, at *4 (M.D. Pa. July 5, 2011) (quoting, ultimately, *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1183–84 (Pa. 1978)).  To make this assessment, one is to consider "the factors listed in [the] Restatement [ (2d) of Torts] section 767," which are "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the proximity or remoteness of the actor's conduct to the interference and (f) the relations between the parties." *Id.* (citations omitted).  The Pennsylvania Supreme Court has referred to this element as requiring a plaintiff to show that a defendant has violated "the rules of the game which society has adopted." *Adler*, 393 A.2d at 1184 (internal quotation marks omitted) (quoting *Glenn*, 272 A.2d at 899).  In *Full Service Vending*, for example, the court denied dismissal of a tortious interference claim because defendant allegedly "specifically induced the third parties to breach the contracts by offering to pay their legal fees," and "[f]inancing a third-party's efforts to break a contract is not conduct normally sanctioned by the rules of the game as normally played under these circumstances."  2011 WL 2632798, at *4.

b.  <u>Application</u>

Plaintiffs have sufficiently pleaded their tortious interference claim against Invesco.  As noted above, they allege facts supporting the inference that Invesco directed OFI to take actions for the purpose of decreasing the Earn-Out Payments due under the SPA.  Invesco's counter-argument, that it lacked the requisite "intent," (OFI Reply 8), is rejected because I already found Plaintiffs have sufficiently pleaded facts to allow the inference that Invesco acted purposely.

### 2.    Breach of Contract Liability Through Veil-Piercing

#### a.  Applicable Law

Under Colorado law, which is the state of OFI's incorporation, (Compl. ¶ 17),[12]

"extraordinary circumstances" will allow for veil-piercing, such that "a shareholder [will] be

individually liable for the corporation's actions," if the plaintiff can make three showings by

clear and convincing evidence.  *See Stockdale v. Ellsworth*, 407 P.3d 571, 576–77 (Colo. 2017)

(quoting *In re Phillips*, 139 P.3d 639, 644 (Colo. 2006) (en banc)).  First, plaintiff must show

that "the corporation is merely the alter ego of the shareholder."  *Id.*  In conducting the "alter

ego" analysis, "a court should consider a number of factors" meant to assess whether "the

corporate form has been abused."[13]  *Id.*  For example, Colorado law allowed for a shareholder to

be considered an alter ego of a corporation where the "shareholder is the sole managing partner"

of the company; the company "did not have its own checking account, its own cash, or any loan

agreement" in its own name; the company "did not own other property, had never received any

income, and did not file tax returns; and" the shareholder "used these alter ego entities to

perpetuate a wrong."  *Id.* at 577.  Second, a reviewing court must determine "whether justice

requires recognizing the substance of the relationship between the shareholder and corporation

over the form because the corporate fiction was 'used to perpetuate a fraud or defeat a rightful

claim.'"  *Phillips*, 139 P.3d at 644 (quoting *Contractors Heating & Supply Co. v. Scherb*, 432

---

[12] "Under New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded."  *Am. Lecithin Co.*, 2017 WL 4402535, at *13 (alteration marks omitted) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).  OFI and Invesco agree that Colorado law applies.  (OFI Reply 5 (citing various cases on Colorado law).)

[13] These factors "include[e] whether (1) the corporation is operated as a distinct business entity, (2) funds and assets are commingled, (3) adequate corporate records are maintained, (4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) the corporation is used as a 'mere shell,' (7) shareholders disregard legal formalities, and (8) corporate funds or assets are used for noncorporate purposes."  *Phillips*, 139 P.3d at 644 (internal quotation marks omitted).

P.2d 237, 239 (Colo. 1967)).  "Third, the court must evaluate whether an equitable result will be achieved by disregarding the corporate form and holding the shareholder personally liable for the acts of the business entity.  Achieving an equitable result is the paramount goal of traditional piercing of the corporate veil."  *Id.* (internal citation omitted).

### b.  Application

Veil-piercing is not warranted here.  As an initial matter, no allegations in the Complaint suggest that Invesco abused OFI's corporate form such that OFI is Invesco's alter-ego.  Moreover, even if I were to find that Invesco "abused [OFI]'s separate corporate existence to carry out a fraud" or something similarly egregious, *Matthys v. Narconon Fresh Start*, 104 F. Supp. 3d 1191, 1203 (D. Colo. 2015), this case is not one "where justice requires" setting aside OFI's separate corporate form, since OFI's separate entity status will not "defeat a rightful claim."  *Contractors Heating*, 432 P.2d at 587–88.  Here, Plaintiffs have another pathway to liability.  If they can prove the requisite intent, they can recover against Invesco for tortious interference.  *See supra*.

### C.  *MM's Liability*

Plaintiffs seek to hold MM liable on the grounds that (1) it tortiously interfered with the SPA by entering into the Merger while "on notice that OFI" would take actions "in plain breach of the SPA" and (2) that piercing OFI's corporate veil can lead to MM's liability for breach of the SPA.  (MM Opp. 1–2.)[14]  Both arguments fail, as Plaintiffs have not alleged that MM engaged in any relevant activity prior to the Merger that would have resulted in its being liable for an underlying breach of the SPA, and Plaintiffs plead no facts suggesting that MM should be

---

[14] "MM Opp." refers to Plaintiffs' Memorandum of Law in Opposition to MM Asset Management Holding LLC's Motion to Dismiss.  (Doc. 25.)

liable for any post-Merger conduct.

As to tortious interference, Plaintiffs plead no facts to support an inference that MM "intended" for the Merger to "interfere[e]" with the SPA and "acted in part . . . for th[at] purpose." *See Glenn*, 272 A.3d at 899.  Plaintiffs argue that their pleadings support an inference of knowledge, because "MM, a sophisticated participant in the investment industry, understood full well" what Invesco would do after acquiring OFI.  (MM Opp. 12.)  This is conclusory, as Plaintiffs fail to allege why MM should have understood what Invesco allegedly intended to do after acquiring OFI.  The mere fact that MM is "a sophisticated participant in the investment industry" does not on its own lead to the inference Plaintiffs advocate.  Plaintiffs allege specific acts Invesco undertook after the Merger to cause reduced Earn-Out Payments, (Compl. ¶ 155), and they never allege facts suggesting that MM had any reason to know what Invesco would do or that MM played a role in those acts.

Even if Plaintiffs had adequately pleaded that MM knew the granular details of how Invesco would manage OFI's ETFs after the Merger, that would still be insufficient as a matter of law.  Plaintiffs do not cite, and I could not find, any controlling precedent under Pennsylvania law stating that knowledge can satisfy tortious interference's intent requirement.  Plaintiffs cite one case that allows a tortious interference claim to proceed where only knowledge was pleaded, but that case relies on a comment from the Restatement (Second) of Torts.  *See Clark Distribution Sys., Inc. v. ALG Direct, Inc.*, No. 1:10-CV-2575, 2013 WL 3510878, at *6 (M.D. Pa. July 11, 2013) (quoting, ultimately, Restatement (Second) Torts § 766, cmt. j).[15]  The

---

[15] The Restatement comment also notes that "[t]he fact that this interference with the other's contract was not desired and was purely incidental in character is, however, a factor to be considered in determining whether the interference is improper."  Restatement (Second) of Torts § 766 cmt. j.  Whether interference is improper is captured by the third element of the tortious interference claim, which requires a plaintiff to plead "the absence of privilege or

Pennsylvania Supreme Court appears never to have considered this comment.  In contrast, Pennsylvania courts read the Pennsylvania Supreme Court's precedents on tortious interference to "require[] proof that the defendant acted 'for the specific purpose of causing harm to the plaintiff.'"  *Selig*, 959 A.2d at 429 (quoting *Glenn*, 272 A.3d at 899 (the tort of interference with contract "is an intentional one:  the actor is acting as he does [f]or the purpose of causing harm to the plaintiff")).  This forecloses Plaintiffs' tortious interference claim against MM.

As to alter-ego liability that could lead to direct breach of contract liability, Plaintiffs' argument must fail because the only actions allegedly taken in breach of the SPA occurred after MM had sold OFI to Invesco.  Indeed, all these actions were allegedly undertaken by OFI, after the Merger, and subject to Invesco's direction and control, not MM's.  (*See* Compl. ¶ 155.)  As such, Plaintiffs have not shown that MM used OFI as "a 'mere instrumentality'" to perpetrate a wrong.  *Phillips*, 139 P.3d at 644 (citation omitted); *cf. W. Convenience Stores, Inc. v. Thielen*, No. 09-CV-02626-LTB-BNB, 2011 WL 866755, at *10 (D. Colo. Mar. 14, 2011) ("facts support[ing] an alter ego determination" included that individual "[d]efendant . . . is the sole owner, operator, officer, and shareholder of" the corporate entity in question).

## V.    Conclusion

For the foregoing reasons, MM's motion to dismiss is GRANTED, and Invesco and OFI's motion to dismiss is GRANTED IN PART and DENIED IN PART.  Counts I and V of the Complaint remain, and Counts II, III, IV, VI, and VII are dismissed.

---

justification on the part of the defendant."  *Clark Distribution Sys.*, 2013 WL 3510878, at *6.  Plaintiffs do not make sufficient pleadings as to this element—they merely state that MM "tortiously interfered . . . without justification," (Compl. ¶ 236), without any factual allegations to support this conclusion.

The Clerk of Court is respectfully directed to terminate the open motions at docket

numbers 17 and 20.

SO ORDERED.

Dated:  March 31, 2022
        New York, New York

Vernon S. Broderick
United States District Judge